**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

JAMES WAYBRIGHT, as personal
representative and co-executor of
the estate of Andrew Waybright
(deceased); SHIRLEY WAYBRIGHT,
individually and as personal
representative and co-executor of
the estate of Andrew Waybright
(deceased),

          *Plaintiffs-Appellants,*

        v.

FREDERICK COUNTY, MARYLAND,
DEPARTMENT OF FIRE & RESCUE
SERVICES; WALTER F. MURRAY, in his
official capacity as Fire Emergency
Director for the Frederick County
Department of Fire & Rescue
Services; JEFFREY COOMBE, in his
official capacity as training officer
for the Frederick County
Department of Fire & Rescue
Services; STANLEY POOLE, in his
official capacity as a member of the
Frederick County Department of
Fire & Rescue Services; FREDERICK
COUNTY; JAN H. GARDNER, in her
individual and official capacity as a
member of the Frederick County
Board of Commissioners; DAVID
GRAY, in his individual and official
capacity as a member of the
Frederick County Board of

No. 07-1289

Commissioners; ANDREW MARSH, in his individual and official capacity as an officer in the Frederick County Department of Fire & Rescue Services; MARK MCNEAL, in his individual and official capacity as an officer in the Frederick County Department of Fire & Rescue Services; TERRE RHODERICK, in his individual and official capacity as a member of the Frederick County Board of Commissioners; JOHN L. THOMPSON, JR., in his individual and official capacity as a member of the Frederick County Board of Commissioners; RICHARD WELDEN, in his individual and official capacity as a member of the Frederick County Board of Commissioners,
                    *Defendants-Appellees.*

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Richard D. Bennett, District Judge.
(1:05-cv-00055-RDB)

Argued: March 21, 2008

Decided: June 2, 2008

Before WILKINSON, KING, and GREGORY, Circuit Judges.

Affirmed in part, reversed in part, and remanded by published opinion. Judge Wilkinson wrote the opinion, in which Judge King and Judge Gregory joined.

**COUNSEL**

**ARGUED:** Peter Tyler Enslein, LAW OFFICE OF PETER T. ENS-LEIN, P.C., Washington, D.C., for Appellants. Thomas Vincent McCarron, SEMMES, BOWEN & SEMMES, Baltimore, Maryland; Scott M. Hartinger, ETHRIDGE, QUINN, MCAULIFFE, ROWAN & HARTINGER, Rockville, Maryland, for Appellees. **ON BRIEF:** Kenneth M. Berman, H. David Leibensperger, BERMAN, SOBIN & GROSS, L.L.P., Gaithersburg, Maryland; Patrick S. Guilfoyle, LAW OFFICE OF PETER T. ENSLEIN, P.C., Washington, D.C., for Appellants. Christopher J. Lyon, SEMMES, BOWEN & SEMMES, Baltimore, Maryland, for Appellees.

---

**OPINION**

WILKINSON, Circuit Judge:

Andrew Waybright died by accident while training to join the Frederick County Fire Department in Maryland. His parents brought suit on state constitutional and tort law grounds — but also, with the same conduct in view, under 42 U.S.C. § 1983 and substantive due process. The § 1983 claims overreach; nothing defendants did rises to the level of a due process violation, and accidents in the main are a matter of state law. As to the state constitutional and tort law claims, we remand them to state court, where this case began and where it still belongs.

I.

A little before seven on the morning of July 3, 2002, new recruits for the Frederick County Fire Department assembled for outdoor physical training. A firefighter named Jeffrey Coombe was supervising, and he drove the recruits hard. He had told the group that he didn't like quitters and didn't like to hear "I can't." That morning, for an hour, with temperatures rising to eighty-four degrees and a heat index rising to ninety-six, recruits ran 4.3 miles, did squats, pushups, and other calisthenics, and ran wind sprints. Coombe did not bring water, or communications, transportation, or first-aid equipment.

Many of the recruits struggled during the session and some experienced disorientation and pronounced exhaustion. One told Coombe that he was dizzy, and Coombe told him to rest.

A 23-year-old recruit named Andrew Waybright started looking sick and pale during the workout. Another recruit asked if Waybright wanted to say something to Coombe, but Waybright said no. Just before 8:10 A.M., as the session was concluding and everyone was heading back to the Training Center, Waybright collapsed in the grass. He tried to crawl back to the Training Center, saying "I want to finish with my class," and was able to get up briefly. But his legs were shaky and Coombe told him to rest where he was.

As Waybright lay there, two bystanders came by and offered to call 911, but another firefighter, Eckhardt (who was also an emergency medical technician), said that Waybright was "just played out," no need to call. Coombe stayed with Waybright briefly, but did not administer first aid. Before leaving, Coombe assigned Eckhardt to watch over Waybright. At the Training Center, Coombe told a second firefighter, Grossnickle, to get a pickup truck to pick Waybright up.

While Eckhardt waited with him, Waybright lost consciousness. Eckhardt had no phone or radio, but when Grossnickle arrived in the truck, Eckhardt told him to call 911. Grossnickle returned to the Training Center, told another firefighter to call 911, and brought a paramedic back to the scene. He returned to the Training Center to look for medical equipment, which he couldn't find.

At about 8:15, Waybright went into cardiac arrest. The paramedic administered CPR, and soon thereafter an ambulance arrived and took Waybright to the emergency room — where, at 9:22, he died. An autopsy revealed that he had no preexisting conditions and died of hyperthermia (heat stroke).

A Frederick County Board of Inquiry was impaneled and, after considerable investigation, issued a report in January 2003. With respect to Coombe, the report found that he failed to bring water to the training session (contrary to protocol), overlooked the recruits' distress during the session, and failed to recognize the emergency situation that occurred when Waybright collapsed. With respect to Fred-

erick County's recruiting school, the report found that its staff was overloaded and undertrained (Coombe, for example, had no certification in physical fitness), and that the school simply could not be run safely without substantial reform. It also found that at least one supervisor knew about these problems to some extent. In response to the incident and report, the recruiting school was shut down for several years and training outsourced to other jurisdictions.

In March 2004, Andrew Waybright's parents filed a tort suit in state court against Jeffrey Coombe, various co-workers in the Frederick County Fire Department, and the Department itself. The complaint alleged wrongful death, loss of solatium, and survival, all premised on negligence. At a hearing in mid-November, the court dismissed the survival claim.

Before the state court could rule on the remainder of the case, plaintiffs filed an amended complaint adding new defendants and new causes of action, some of which were federal. Defendants, invoking federal question jurisdiction, removed to federal district court — where over the next two-and-a-half years, the case ballooned, swelling in complexity to such an extent that the second amended complaint, at seventy-nine pages, was almost six times the original state complaint's length, and the district court needed a chart to keep track of the claims and defendants. *See Waybright v. Frederick County Md. Dep't of Fire & Rescue Servs.*, 475 F. Supp. 2d 542, 548 (D. Md. 2007). When all was said and done, plaintiffs had lodged three types of claims against four types of defendants.

First was a 42 U.S.C. § 1983 (2000) claim, premised on Waybright's substantive due process right to life and directed against Coombe, various supervisors at the Fire Department, various members of the Frederick County Board of Commissioners, and Frederick County itself. With respect to Coombe, the claim stemmed from his conduct on that July 3d morning; as to the others, it stemmed from their supervisory role in creating the conditions that allegedly led to Waybright's death. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-91 (1978); *Carter v. Morris*, 164 F.3d 215, 220-21 (4th Cir. 1999). Second was a state constitutional claim, based on Article 24 of the Maryland Declaration of Rights ("no man ought to be . . . deprived of his life, liberty or property, but by . . . the Law of the

land"), and directed against Coombe, the supervisors at the Fire Department, and the commissioners of the Board. Third were the original state tort claims, based on wrongful death, loss of solatium, and (despite the state court's ruling) survival, and directed against Coombe, the supervisors at the Department, and Frederick County.

Defendants moved for summary judgment, and, in March 2007, the district court granted it with respect to plaintiffs' federal and state constitutional claims, but remanded the tort claims to the Circuit Court for Frederick County. *Waybright*, 475 F. Supp. 2d 542. First, the district court rejected plaintiffs' § 1983 due process claim, holding that Coombe's conduct was not egregious enough to "shock the conscience" as a constitutional matter because the harm Coombe did was not intentional. *See County of Sacramento v. Lewis*, 523 U.S. 833, 846-49 (1998). The district court reasoned, second, that the federal due process analysis should control the state Article 24 analysis, citing the Maryland Court of Appeals for the proposition that the two are "*in pari materia*, such that the interpretations of the Due Process Clause of the Fourteenth Amendment provided by the United States Supreme Court serve as persuasive authority for Article 24." *Pickett v. Sears, Roebuck & Co.*, 775 A.2d 1218, 1224 (Md. 2001). Finally, as to plaintiffs' state tort claims, the district court declined to exercise supplemental jurisdiction and remanded them to state court. Plaintiffs timely appealed.

II.

The § 1983 claim against Jeffrey Coombe is the gateway to all the other § 1983 claims, for supervisors and municipalities cannot be liable under § 1983 without some predicate "constitutional injury at the hands of the individual [state] officer," at least in suits for damages. *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986); *see also Grayson v. Peed*, 195 F.3d 692, 696 (4th Cir. 1999). Here, the individual constitutional wrong alleged is that Coombe deprived Waybright "of his right to life under the Fourteenth Amendment to the U.S. Constitution" — a substantive due process claim. *Second Am. Compl.* ¶ 114. If this allegation survives scrutiny, we go on to the others; if not, the federal side of this case comes to a close.

## A.

The Fourteenth Amendment's Due Process Clause protects a set of interests — life, liberty, and property — that are also protected by state tort law. Together with § 1983, then, there is some risk of the Clause supplanting state tort law in almost any suit alleging that a local official has caused harm. In case after case, the Supreme Court has rejected this prospect and spurned any approach to the Fourteenth Amendment that would make it "a font of tort law to be superimposed upon whatever systems may already be administered by the States." *Paul v. Davis*, 424 U.S. 693, 701 (1976). *See also County of Sacramento v. Lewis*, 523 U.S. 833, 848 (1998) ("[T]he due process guarantee does not entail a body of constitutional law imposing liability whenever someone cloaked with state authority causes harm."); *Collins v. City of Harker Heights*, 503 U.S. 115, 128-29 (1992) ("[W]e have previously rejected claims that the Due Process Clause should be interpreted to impose federal duties that are analogous to those traditionally imposed by state tort law."); *DeShaney v. Winnebago County Dep't of Social Servs.*, 489 U.S. 189, 202 (1989) ("[T]he Due Process Clause of the Fourteenth Amendment . . . does not transform every tort committed by a state actor into a constitutional violation."); *Daniels v. Williams*, 474 U.S. 327, 332 (1986) ("Our Constitution . . . does not purport to supplant traditional tort law in laying down rules of conduct to regulate liability for injuries that attend living together in society."); *Baker v. McCollan*, 443 U.S. 137, 146 (1979) ("Section 1983 imposes liability for violations of rights protected by the Constitution, not for violations of duties of care arising out of tort law.").

Two principles stand out in these cases. The first involves a certain sense of constitutional magnitude — a sense that, as due process at the core combats "*arbitrary* action" of government, *County of Sacramento*, 523 U.S. at 845 (emphasis added), applying the Clause to the ordinary run of governmental neglect, inaction, and bad policy would diminish it. Thus we find the Court remarking that "only the most egregious official conduct can be said to be arbitrary in the constitutional sense," *id.* at 846 (quotation omitted); that the Constitution "deals with the large concerns of the governors and the governed," *Daniels*, 474 U.S. at 332; that courts should exercise "judicial self-restraint" and "utmost care" in novel substantive due process cases, *Collins*, 503 U.S. at 125; and that the Clause "was intended to prevent

government from abusing its power, or employing it as an instrument of oppression," *DeShaney*, 489 U.S. at 196 (quotation omitted), and it would not do to "trivialize" it, *Daniels*, 474 U.S. at 332. Repeatedly, the Court quotes Chief Justice Marshall's great admonishment: "[W]e must never forget, that it is *a constitution* we are expounding." *McCulloch v. Maryland*, 4 Wheat. 316, 407 (1819) (emphasis in original), *quoted in County of Sacramento*, 523 U.S. at 846; *Daniels*, 474 U.S. at 332; and *Paul*, 424 U.S. at 732 (Brennan, J., dissenting).

Second is concern for the authority of state governments over areas traditionally assigned to state law — and with that, disquiet at the potentially staggering practical consequences of empowering federal judges to oversee everything from pillows left on prison stairs (*Daniels*) to sewer maintenance (*Collins*) with the inflexible instrument of constitutional law. Thus *Collins* states that decisions about how to allocate resources in state government "involve a host of policy choices that must be made by locally elected representatives, rather than by federal judges interpreting the basic charter of Government for the entire country." 503 U.S. at 129. And *Paul v. Davis*, "paus-[ing] to consider the result" should § 1983 be interpreted to "trans-mute[ ]" ordinary torts against the government into Fourteenth Amendment claims, points out that almost anyone wronged by local authority would obtain a constitutional claim under such a view — a result that "would come as a great surprise to those who drafted and shepherded the adoption of that Amendment." 424 U.S. at 698-99.

With these principles in mind, the Supreme Court has, for half a century now, marked out executive conduct wrong enough to register on a due process scale as conduct that "shocks the conscience," and nothing less. *County of Sacramento*, 523 U.S. at 846 (quoting *Rochin v. California*, 342 U.S. 165, 172 (1952)). The shocks-the-conscience test turns on degree of fault. For a due process challenge to executive action to succeed, the general rule is that the action must have been "intended to injure in some way unjustifiable by any government interest." *County of Sacramento*, 523 U.S. at 849. As to "negligently inflicted harm," it is "categorically beneath the threshold of constitutional due process." *Id.* And as to "culpability falling within the middle range, following from something more than negligence but less than intentional conduct," the Court has allowed that it may have constitutional implications, but only in special circumstances. *Id.* (quota-

tion omitted). As to what those special circumstances are, the Court has issued no general rule except that judges should proceed with "self-restraint" and "utmost care," *Collins*, 503 U.S. at 125, and make "an exact analysis" of the circumstances presented "before any abuse of power is condemned as conscience shocking," *County of Sacramento*, 523 U.S. at 850.

What this body of law on the whole makes clear is that, where a claim sounds both in state tort law and substantive due process, state tort law is the rule and due process the distinct exception. In other words, the Supreme Court has established a strong presumption that § 1983 due process claims which overlap state tort law should be rejected and the case, if diversity is lacking, sent to state court. The presumption is rebuttable: It can be overcome by showing governmental conduct so "arbitrary" and "egregious" that it "shocks the conscience," usually because a state actor intended harm without justification. *County of Sacramento*, 523 U.S. at 845-46, 849. But the presumption should be vigorously applied, for without it, a problem arises that we see in the present case and never want to see in law: basic difficulty and extensive litigation over the forum in which a case belongs — a threshold question that tells plaintiffs and defendants nothing about the merits of the case and delays resolution for all.

Plaintiffs' § 1983 due process claim overlaps state tort law; there is thus a presumption against it. The most likely path for overcoming the presumption is closed, for under no construction of events could Coombe be said to have intended Waybright's death. And to the extent Coombe was negligent, the claim is not a constitutional one and the presumption stands. Thus plaintiffs' only option is to argue, against a presumption to the contrary, that this case presents one of those special circumstances in which culpability in the middle range — here, deliberate indifference — should shock the conscience to such an extent that a federal action lies.

B.

Plaintiffs' first and major argument for recognizing a federal substantive due process claim is that Coombe, in their view, had time before Waybright's collapse to deliberate about the dangers awaiting

recruits. Coombe knew how dangerous it was to exercise outside in the heat without adequate hydration; he had given a PowerPoint presentation on the subject just the day before the fatal run. And although one might disagree as to whether Coombe had time to deliberate after Waybright collapsed, plaintiffs argue, he certainly had time beforehand to make an unrushed decision about the need to have water on hand. According to plaintiffs, it was this time to deliberate that transmuted what might otherwise be ordinary negligence into a form of deliberate indifference cognizable under the U.S. Constitution.

The support for this argument comes from the Sixth Circuit's remarks in *Estate of Owensby v. City of Cincinnati* that "[t]he determining factor" when deciding whether deliberate indifference shocks the conscience should be "whether the circumstances allowed the state actors time to fully consider the potential consequences of their conduct." 414 F.3d 596, 602 (6th Cir. 2005) (quotation omitted). But the case law as a whole is against a general rule that time to deliberate transforms negligent error into constitutionally shocking conduct. The D.C. Circuit has rejected the rule, holding that "[t]he opportunity for deliberation alone is not sufficient to apply" a lower bar to substantive due process claims. *Fraternal Order of Police Dep't of Corr. Labor Comm. v. Williams*, 375 F.3d 1141, 1146 (D.C. Cir. 2004). And the Supreme Court, we think, has done the same. In holding that due process does not require governmental employers to provide a safe workplace, but that state tort law may, *see Collins v. City of Harker Heights*, 503 U.S. 115 (1992), the Court necessarily rejected the time to deliberate theory — for employers most often have time to deliberate about workplace conditions. The Court has also held that there is no deliberate indifference without actual knowledge of a danger, *see Farmer v. Brennan*, 511 U.S. 825, 837 (1994) — and of course one can have time to deliberate about danger without having actual knowledge of it.

The time to deliberate theory is also difficult to apply. What part of the challenged conduct matters? Does the opportunity to deliberate begin months or weeks before an accident, the night before, or at the time events unfolded? This question would emerge in many cases besides Waybright's because longstanding conditions often lead to rapidly unfolding harm. Also, when has one had enough time to deliberate? What kind of prior notice of potential danger causes the delib-

erative duty to kick in? These and other questions have real litigious potential. Indeed, they threaten more cases like the present one, where confusion over what belongs in state and what in federal court leads to delay for plaintiffs in getting relief and uncertainty for defendants in finding out if liability attaches.

Plaintiffs' second argument is that a federal question arises because Coombe and Waybright were in what the Supreme Court has called "a special relationship." *See DeShaney v. Winnebago County Dep't of Social Servs.*, 489 U.S. 189, 197-200 (1989). It is true that, where the state is in a special relationship to a private individual, it acquires a duty to act on that individual's behalf and its failures to act are measured on a deliberate indifference standard; that is why a conscious disregard of the rights of prisoners, pretrial detainees, and committed mental patients have traditionally been examined for deliberate indifference. *See Patten v. Nichols*, 274 F.3d 829, 836-37 (4th Cir. 2001). The problem is that "special relationship" is a term of art that does not apply to Coombe and Waybright.

As *DeShaney* indicates and our case law specifies, a "special relationship" is all but synonymous with a custodial relationship. *See DeShaney*, 489 U.S. at 199-200 ("[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being."); *Pinder v. Johnson*, 54 F.3d 1169, 1175 (4th Cir. 1995) (en banc) ("This Court has consistently read *DeShaney* to require a custodial context before any affirmative duty can arise under the Due Process Clause."). The idea of a custodial relationship is a circumscribed one, grounded in the rationale *DeShaney* gives for it: "[W]hen the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs . . . it transgresses the substantive limits on state action . . . ." 489 U.S. at 200. Thus "[s]ome sort of confinement" is needed to render a relationship custodial, such as "incarceration, institutionalization, or the like." *Pinder*, 54 F.3d at 1175. Coombe did not confine Waybright in this sense. Waybright was free to walk away from the exercise session and the job. *See Collins*, 503 U.S. at 128 (holding that a city employee in a dangerous workplace is not in a

custodial relationship because he has "voluntarily accepted[ ] an offer of employment").

Plaintiffs' third argument is that a substantive due process claim arises because Coombe created the danger Waybright faced. As we stated in *Pinder*, "[w]hen the state itself creates the dangerous situation that resulted in a victim's injury, the absence of a custodial relationship may not be dispositive." 54 F.3d at 1177. Here, plaintiffs argue, the training session should qualify as a state-created danger because a state actor, Coombe, "used his authority to create an opportunity for danger that otherwise would not have existed," and thereby knowingly put Waybright in harm's way. *Rivas v. City of Passaic*, 365 F.3d 181, 194 (3d Cir. 2004).

To apply the state-created danger theory in this context, however, would run afoul of the Supreme Court's unanimous decision in *Collins*, 503 U.S. 115, which held that due process does not impose a duty on municipalities to provide their employees with a safe workplace or warn them against risks of harm (though state tort law may). The case is right on point, for plaintiffs' state-created danger claim, in essence, is that Coombe created an unsafe workplace that caused a prospective employee harm. And while we recognize that *Collins* involved a municipal rather than an individual defendant, the case speaks decisively to the situation here.

The underlying concern in *Collins* was that constitutional law would push state tort law aside whenever a state or local government acted as employer, thus placing "a host of policy choices that must be made by locally elected representatives" with "federal judges interpreting the basic charter of Government for the entire country." *Id.* at 129. The state-created danger theory in the present case portends just such a federal displacement of state authority over state activities, for it would potentially set up a federal question whenever an accident happens during activities sponsored by the state. The practical consequences would be immense; by finding a state-created danger here, we might well inject federal authority into public school playground incidents, football (or even ballet) practice sessions, and class field trips, not to mention training sessions for government jobs that require some degree of physical fitness. Sometimes practice is demanding because games are demanding, and training is demanding

because jobs are demanding, and how best to conduct these sessions can rarely be the focus of a constitutional claim. To transform ordinary mishaps into constitutional questions would not only bring them into federal court more frequently. Because Congress and the federal judiciary often set the ground rules for those claims in terms of scope of immunity, availability of punitive damages, award of attorneys' fees, and the like, the displacement of state law with federal policies would be difficult to overstate.

C.

Plaintiffs' attempt to create a federal claim is thus all but at a close. The facts reveal a terribly sad occurrence, but not conduct that meets the constitutional threshold.

The Supreme Court has held that "only the most egregious official conduct" can shock the conscience. *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998). Successful claims in this area typically feature quite extreme governmental wrongdoing. *See, e.g.*, *Rochin v. California*, 342 U.S. 165 (1952) (pumping a suspect's stomach to look for drugs). But here, under no plausible reading of the facts did Coombe even know that Waybright was in serious, let alone mortal, danger. When Waybright started to feel ill during the workout, he did not tell Coombe. (Another recruit, who did tell Coombe when he felt dizzy, was given a break.) When Waybright collapsed, he did not immediately lose consciousness, and indeed "got back up under his own power" and "kept saying, 'I want to finish with my class,'" according to the Board of Inquiry report. No one at that time seems to have recognized how serious Waybright's situation was; hence the remark by another firefighter, when two passers-by offered to call 911, that there was no need to call because Waybright was "just played out." In addition, Coombe did not ignore or disregard Waybright's distress when he learned of it. After Waybright stood up in an effort to continue, it was Coombe who told him to rest instead. Coombe also assigned a second firefighter (one with medical training) to look after Waybright, and told a third firefighter to get a vehicle to pick Waybright up. This conduct is a far cry from shocking the conscience. It was, rather, as the Board of Inquiry concluded, an under-reaction — that is, a misjudgment. Whether it was a negligent misjudgment is not for us to say, but misjudgments such as these are

"categorically beneath the threshold of constitutional due process." *County of Sacramento*, 523 U.S. at 849.

Of course, one wishes dearly that Coombe had acted differently. "Tragic circumstances," as we have remarked, "only sharpen our hindsight . . . ." *Pinder v. Johnson*, 54 F.3d 1169, 1178 (4th Cir. 1995). In that spirit, plaintiffs urge us to turn our focus away from Coombe's conduct after Waybright collapsed and toward Coombe's initial decision to go on the run without water or other supplies. But one way of improperly using hindsight is to reason backwards from an accident to the decisions that set it into motion. One must instead take the situation *ex ante*, from the perspective of the state official, and ask whether his or her decisions when he or she made them were of a magnitude to shock the conscience. Instruction that seems over-zealous, and precautions that seem insufficient, do not reach that level.

We therefore affirm the district court's denial of plaintiffs' § 1983 claim against Coombe. And with the claim against Coombe gone, so go the § 1983 claims against everyone else. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986); *Grayson v. Peed*, 195 F.3d 692, 696 (4th Cir. 1999).

### III.

The federal side of this case is at an end. What remain, however, are plaintiffs' state constitutional claims under Article 24 of the Maryland Declaration of Rights and the state tort claims with which this case began. The district court dismissed the constitutional claims because, according to *Pickett v. Sears, Roebuck & Co.*, 775 A.2d 1218, 1224 (Md. 2001), Article 24 and the federal Due Process Clause are to be interpreted "*in pari materia*." But the court declined to exercise supplemental jurisdiction over the tort claims, and remanded them, because they "involve novel and complex arguments regarding the interplay between" various state statutes, as well as the "impact of those rulings" already made in this case in the Circuit Court for Frederick County. *Waybright v. Frederick County Md. Dep't of Fire & Rescue Servs.*, 475 F. Supp. 2d 542, 556-57 (D. Md. 2007).

We agree with the district court's decision as to the tort claims, but it erred in passing on the merits of plaintiffs' Article 24 claim. Since *Pickett* was decided, *Dua v. Comcast Cable of Md., Inc.*, 805 A.2d 1061, 1072 (Md. 2002), stated that federal decisions about the Due Process Clause "are no more than persuasive authorities" when it comes to applying Article 24, and *Koshko v. Haining*, 921 A.2d 171, 194 (Md. 2007), noted that "the extent of protection bestowed upon liberty interests recognized as being enshrined within the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution does not dictate necessarily the full complement of safeguards extended to liberty interests available under the Maryland due process analog found in Article 24."

We decline to make a close analysis of the issue, however, because there is an even more important reason to decline supplemental jurisdiction here. The upshot of our analysis is that this case is basically a state case gone awry. With all its federal questions gone, there may be the authority to keep it in federal court under 28 U.S.C. §§ 1367(a) and 1441(c) (2000), but there is no good reason to do so. Plaintiffs deserve a day in court on all their state law claims, and the better path is to send their case back to state court whole.

## IV.

This case started life as a perfectly sensible state tort suit. Then, a little repackaging turned its state tort claims into federal due process claims under § 1983 and created a constitutional case — a rather swollen one at that — which, after three-and-a-half years of additional litigation, is going right back to the court and basically the claims with which it started. In part, this case is sad because of the tragedy that set it into motion. But it is sad also because of the long legal detour that stilled all progress on the merits while federal courts necessarily rebuffed the prospect of federal law taking over the traditional office of the states. Plaintiffs had every right to amend their state court complaint; defendants had every right to remove on the basis of a federal question; and plaintiffs had every right to appeal the dismissal of their federal claims. But wisdom may reside in recognizing that less is sometimes more and that zealous advocacy need not always part company with forbearance and restraint. Recognizing this case for what it was and what it remains, we affirm the dismissal of

plaintiffs' federal claims and direct that all state claims be remanded to state court.

*AFFIRMED IN PART,*
*REVERSED IN PART,*
*AND REMANDED*