PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

BLAKE H. MOORE, MD, FACS,
Individually and as the Personal
Representative of the Estate of
Angela Lynn Moore; KINGSTREE
SURGICAL ASSOCIATES, LLC,

        *Plaintiffs-Appellants,*

v.

WILLIAMSBURG REGIONAL HOSPITAL;
JOHN HALES; BRETON JUBERG, MD;
EVELYN ANSA, MD; JOEL
BONAPARTE, MD; BERNADETTE
BONAPARTE, MD; KENNETH
JOHNSON, MD; STEVE COREY,
DPM; MICHELLE COREY-
BUTTERWORTH, DPM; KEVIN
SPRINGLE, MD; GILBERTAS RIMKUS,
MD, Jointly and Severally,

        *Defendants-Appellees,*

and

RAYMOND ALLEN, MD; BASHIR
OBEIDOU, MD; MARION RIGGS,
Jointly and Severally,

        *Defendants,*

PROVIDENCE HOSPITAL,

        *Party in Interest.*

No. 07-1966

Appeal from the United States District Court
for the District of South Carolina, at Florence.
Terry L. Wooten, District Judge.
(4:05-cv-02940-TLW)

Argued: December 3, 2008

Decided: March 12, 2009

Before WILKINSON, DUNCAN, and AGEE,
Circuit Judges.

Affirmed by published opinion. Judge Wilkinson wrote the
opinion, in which Judge Duncan and Judge Agee joined.

## COUNSEL

**ARGUED:** Charles William Hinnant, Jr., MEDICOLEGAL
CONSULTANTS, L.L.C., Anderson, South Carolina, for
Appellants. Travis Dayhuff, NELSON, MULLINS, RILEY &
SCARBOROUGH, L.L.P., Columbia, South Carolina, for
Appellees. **ON BRIEF:** Stuart M. Andrews, Jr., NELSON,
MULLINS, RILEY & SCARBOROUGH, L.L.P., Columbia,
South Carolina, for Appellees Williamsburg Regional Hospi-
tal and John Hales; Marian Williams Scalise, Lydia L. Magee,
RICHARDSON, PLOWDEN & ROBINSON, Myrtle Beach,
South Carolina, for Appellees Breton Juberg, MD, Evelyn
Ansa, MD, Joel Bonaparte, MD, Bernadette Bonaparte, MD,
Kenneth Johnson, MD, Steve Corey, DPM, Michelle Corey-
Butterworth, DPM, Kevin Springle, MD, and Gilbertas Rim-
kus, MD.

**OPINION**

WILKINSON, Circuit Judge:

In this case, a physician brings multiple state law and federal due process claims against a hospital and its officials for suspending his staff privileges based on allegations that he had sexually abused his adopted daughter. While the scope of immunity under the Health Care Quality Improvement Act, 42 U.S.C. § 11101 *et seq.*, certainly has limits, we think the immunity attaches to defendants under the circumstances here, and plaintiff's state law claims fail in any event. We also reject plaintiff's claims that the hospital's suspension of his privileges violates the Due Process Clause, both because the decision to suspend plaintiff's privileges was not state action and because the procedures afforded plaintiff satisfied the Fourteenth Amendment. For these reasons, we affirm the district court's grant of summary judgment to defendants.

I.

Plaintiff is a general surgeon who treats both children and adults in the course of his practice. He formerly held privileges at Williamsburg Regional Hospital ("WRH") in Kingstree, South Carolina. WRH serves a population of fewer than 40,000 people and was previously the Williamsburg County Memorial Hospital. Since October 2001, it has operated as a private non-profit corporation, but the state continues to be involved: the Governor approves the Board of Directors and the state and county provide funding. While practicing at WRH, plaintiff raised numerous complaints about patient care at the hospital, including fatal mistakes in medication dosages and the mishandling of human tissue specimens. He alleges that WRH officers threatened him for voicing these complaints and took the following actions in retaliation.

At some point after the alleged threats, South Carolina Department of Social Services ("DSS") took plaintiff's three

adopted children into emergency protective custody because of allegations that plaintiff's wife had physically abused the children. DSS filed a complaint against plaintiff and his wife in Family Court and placed the children in foster care. While in foster care, plaintiff's adopted daughter told her therapist that she had been sexually abused by plaintiff and his wife. In 2003, two DSS units each investigated the sexual abuse allegations, but found the evidence to be inconclusive and declined to investigate further. Then, in 2004, Clarendon County DSS conducted a third investigation and, after finding by a preponderance of evidence that plaintiff and his wife had sexually abused the child, filed a Family Court complaint seeking to terminate plaintiff's and his wife's parental rights and place them on the Central Registry of Child Abuse and Neglect.

Soon after DSS filed the complaint, defendant Dr. Breton C. Juberg, the WRH Chief of Staff and Chairman of the Medical Executive Committee ("MEC"), became aware of the DSS sexual abuse allegations against plaintiff. He informed defendant John C. Hales, Jr., the Chief Executive Officer of WRH, of the allegations, and Hales obtained a copy of the complaint and other documents from the clerk of the Family Court. The complaint detailed statements the child made to her DSS caseworker, therapist, foster parents, and forensic interviewer about the sexual abuse, and also recounted the prior physical abuse case that had resulted in a finding of Abuse and Neglect against plaintiff and his wife. After reviewing these documents, Hales and Juberg agreed to summarily suspend plaintiff's hospital privileges until the DSS sexual abuse allegations were resolved.

In a letter dated September 13, 2004, Juberg notified plaintiff that his privileges were summarily suspended pursuant to the hospital's Medical Staff Bylaws provisions for corrective action. Juberg explained that "[b]ased upon serious allegations of sexual misconduct of a minor child . . . the Medical Staff and [WRH] believe that the best interest of patient care

and welfare is served by an immediate summary suspension of your clinical staff privileges." Juberg also notified plaintiff that the MEC would review his summary suspension that evening and invited him to present his case, although he would not be allowed to vote on the matter.

At the meeting, the MEC considered several documents from plaintiff's DSS file including the sexual abuse complaint, the DSS probable cause finding, the child's forensic interview report, progress notes from her therapy sessions, drawings by the child, and a Family Court order which included information about the prior physical abuse case. Plaintiff attended the meeting and presented argument, but the MEC ultimately voted to continue his suspension.

Two days later, Hales sent a letter to plaintiff confirming that the MEC had voted to continue his suspension and informing plaintiff of his right to have the decision reviewed in a hearing with representation by counsel pursuant to Article VIII of the hospital's bylaws. The next day, WRH submitted a report to the National Practitioner Data Bank ("NPDB"), as it believed was required by 42 U.S.C. § 11133,[1] stating that plaintiff's clinical privileges had been summarily suspended indefinitely because of "serious allegations of sexual misconduct of a minor child."

Plaintiff requested a review hearing which was held on November 22, 2004. Prior to the hearing, WRH provided plaintiff a list of witnesses expected to testify and a list of Hearing Panel members who were not his economic competitors. To accommodate plaintiff's objection, WRH removed

---

[1]"Each health care entity which—(A) takes a professional review action that adversely affects the clinical privileges of a physician for a period longer than 30 days . . . shall report to the Board of Medical Examiners." 42 U.S.C. § 11133. However, as the NPDB Guidebook emphasizes, a suspension is not reportable when it is due to "administrative reasons not related to professional competence or professional conduct." *See* NPDB Guidebook, at E-21 (September 2001).

one doctor from the panel who had previously treated plaintiff's children. Plaintiff's counsel was then notified of the final panel composition by letter and given an opportunity to object, but plaintiff did not object before the hearing.

At the hearing, Juberg and plaintiff's counsel presented argument. Both sides called witnesses, cross-examined witnesses, and presented documents for the panel to consider. Plaintiff and his wife testified that they did not sexually abuse their daughter and presented evidence including the result of a neuropsychiatric test indicating that plaintiff failed to meet the diagnostic criteria for pedophilia, a prior DSS notice that a sexual abuse investigation was unfounded, and a forensic examination that did not prove sexual abuse. But, during the two additional months the hearing was held open, plaintiff was not able to come forward with evidence the panel considered adequate to dispel its concerns. Ultimately, the panel issued a report upholding the MEC's decision to continue plaintiff's summary suspension.

Plaintiff appealed the panel's decision to WRH's Board of Directors at a full-blown hearing on April 11, 2005. A week later, after receiving additional evidence, the four board members present voted unanimously to uphold the suspension. This marked the end of the review process.

A few months later, on July 7, 2005, DSS filed a motion for voluntary nonsuit with prejudice in the sexual abuse case against plaintiff on the grounds that it would not be in the child's best interests to continue the case. DSS argued that it would be traumatic for the child to testify and the suit would not benefit the child because plaintiff's parental rights had already been terminated pursuant to an agreement of the parties in the physical abuse case. The Family Court entered an order granting DSS's motion for nonsuit on July 11, 2005.

A month later, plaintiff sent a letter to WRH requesting that his clinical privileges be immediately reinstated because DSS

had dismissed the sexual abuse suit and no one had ever filed criminal charges against him. WRH did not reinstate plaintiff, however, because he would not authorize the hospital where he had been practicing during his suspension to provide the necessary credentialing information that WRH needed to reinstate him in accordance with the bylaws. Plaintiff had also requested that WRH void its NPDB report and asserts that he has not been able to accept employment with other health care providers because of the report.

On October 14, 2005, plaintiff filed this suit. He claims that WRH, Hales, Juberg, and other WRH staff members are liable in damages because WRH's suspension of his privileges violated various state laws and 42 U.S.C. § 1983. After discovery, defendants filed a motion for summary judgment on all claims and plaintiff filed a cross-motion for summary judgment on his § 1983 claims. The district court granted defendants' motion on all counts. The court held that defendants were entitled to immunity from plaintiff's state law claims under the Health Care Quality Improvement Act, 42 U.S.C. § 11101 *et seq.*, and that plaintiff's § 1983 claims failed on the merits and because WRH was not a state actor. Plaintiff appeals, and we review the district court's grant of summary judgment *de novo*. *See Holland v. Washington Homes, Inc.*, 487 F.3d 208, 213 (4th Cir. 2007).

## II.

Plaintiff alleges that defendants are liable for intentional infliction of emotional distress, tortious interference with existing and prospective contractual relationships, defamation, breach of contract, promissory estoppel, unfair trade practices, and civil conspiracy. The district court held that defendants were entitled to immunity from all these state law damages claims pursuant to the Health Care Quality Improvement Act ("HCQIA"), 42 U.S.C. § 11101 *et seq.*

A.

The HCQIA provides immunity from damages to participants in a "professional review action" if the action meets certain standards and follows certain procedures. 42 U.S.C. § 11111(a)(1). HCQIA provides this immunity as "incentive and protection for physicians engaging in effective professional peer review." *Id.* at § 11101(5). Congress believed that effective peer review, including mandatory reporting to a nationwide database, could alleviate the national problem of "[t]he increasing occurrence of medical malpractice" by "restrict[ing] the ability of incompetent physicians to move from State to State without disclosure or discovery of the physician's previous damaging or incompetent performance." *Id.* at § 11101; *see also Freilich v. Upper Chesapeake Health, Inc.*, 313 F.3d 205, 211-12 (4th Cir. 2002) (discussing the purpose of HCQIA). However, HCQIA does not provide unqualified immunity to all peer review decisions. In order to ensure that such review is effective and not abused, HCQIA only provides immunity to "professional review actions" based on a physician's "competence or professional conduct," 42 U.S.C. § 11151(9), and it mandates specific standards and procedures that must be followed, *id.* at § 11112(a).

The issue here is whether WRH's action constitutes a "professional review action" within the meaning of HCQIA and therefore falls within the scope of HCQIA immunity at all.[2]

---

[2]Section 11151(9) of HCQIA defines "professional review action" as "an action or recommendation of a professional review body . . . which is based on the competence or professional conduct of an individual physician (which conduct affects or could affect adversely the health or welfare of a patient or patients), and which affects (or may affect) adversely the clinical privileges . . . of the physician." 42 U.S.C. § 11151(9). It provides further that "an action is not considered to be based on the competence or professional conduct of a physician if the action is primarily based on—" (A) a physician's association with a professional society, (B) a physician's fees or advertising, (C) a physician's participation in certain types of health plans, (D) a physician's association with a private group practice, "or (E) any other matter that does not relate to the competence or professional conduct of a physician." *Id.*

Plaintiff argues that WRH's suspension of his privileges is not a "professional review action" because it was not based on his "competence or professional conduct." He argues that allegations of sexual abuse outside of the professional context are not related to his competence or his professional conduct as a doctor. He urges a stark dividing line between private and professional conduct and contends that "[n]on-medical allegations" cannot be the basis for professional review actions because they are only proper when medical expertise is necessary to the determination.

Even though many "professional review actions" are based on (1) medical conduct at a health care facility that (2) occurred at some point in the past, *see e.g.*, *Gaboldoni v. Washington County Hosp. Ass'n*, 250 F.3d 255, 258 (4th Cir. 2001); *Imperial v. Suburban Hosp. Ass'n*, 37 F.3d 1026, 1029 (4th Cir. 1994), we think plaintiff's argument that only such conduct is covered goes too far. First, when describing allowable bases for a professional review action, the statute begins with the critical term "competence." 42 U.S.C. § 11151(9). A physician's competence can be implicated by conduct outside a health care facility if there is a clear nexus between that conduct and the ability to render patient care. Second, the statute says "professional conduct" rather than "conduct in the course of medical practice" or "conduct that occurs in the hospital." Tellingly, therefore, Congress chose to use language that was somewhat broader than the more specific formulations plaintiff suggests. Moreover, the statutory definition includes a parenthetical defining "professional conduct" to include "conduct [which] affects or *could affect* adversely the health or welfare of a patient or patients." 42 U.S.C. § 11151(9) (emphasis added). This parenthetical clearly implies that the term "professional conduct" is not limited to past medical conduct that has already affected patient welfare. Instead, HCQIA immunity allows hospitals to take prophylactic measures that need not involve proof of improper conduct beyond a reasonable doubt so long as statutory procedures designed to protect the reputation and livelihood of the physician have

been observed. In short, nothing in the statute requires peer review committees to wait until medical disaster strikes.

Contrary to plaintiff's position then, HCQIA immunity may protect review actions based on conduct that has occurred outside of the hospital, but could realistically occur or affect treatment in the hospital. At some point, a peer review committee could surely conclude that it was only a matter of time before erratic or destructive behavior outside the medical setting began to manifest itself in patient care. If plaintiff's view were accepted, however, peer review committees would never under any circumstances be permitted to conclude that even the most advanced cases of alcohol addiction, illegal substance abuse, incipient dementia, or, as here, sexual misconduct toward children on the part of someone with a pediatric practice could affect professional "competence." 42 U.S.C. § 11151(9). Nor does the immunity depend, as plaintiff suggested at argument, upon whether the peer review decision required the application of medical expertise. The line between strictly medical and non-medical expertise would be a difficult one to draw (must the medical expertise relate to the physician's conduct or condition, the nature of the physician's practice, or the connection between the two?). Clearly the "competence" of a physician may be affected by arguably non-medical difficulties which are manifested outside the hospital: a hopelessly alcoholic physician or one adjudged to be mentally incompetent could only by happenstance render competent patient care. Most importantly, the statute did not adopt plaintiff's proposed "medical expertise" standard. Adopting a strict line between professional and private conduct, or one based on the need for medical expertise, would improperly restrict the scope of HCQIA immunity and thereby involve the courts unduly in matters of hospital governance. Congress struck a careful balance between protecting physicians who are subject to professional review actions and providing immunity that encourages peer review and protects patients. Plaintiff's view of the statute compromises the latter goal.

At the other end, the hospital defendants urge us to adopt a broad interpretation of "professional review action" that encompasses almost any action based on conduct that might, in the peer review body's opinion, one day affect patient care. Defendants argue that because the whole purpose of HCQIA was to encourage peer review, Congress meant to provide an expansive grant of immunity.

The breadth of defendants' argument ignores the limiting language of the statute. It can be argued, of course, that almost any form of private misconduct may have some conceivable impact on a physician's performance, but no fair reading of the statute (with its emphasis upon competence and professional conduct) would indicate Congress intended to go nearly so far. Human beings are not smooth and rounded pebbles, but often contradictory in their habits and traits. A surgeon whose personal life might not bear close scrutiny may nonetheless save lives with his talents in the operating room.

Giving peer review bodies the discretion to suspend staff privileges and report physicians for largely private defalcations is thus to arm those reviewers with a club that Congress did not provide. Defendants' view poses the risk that driving infractions, messy divorces or custody battles, tax or financial difficulties only tenuously or speculatively related to medical competence might fall within the purview of peer review. But this view is untenable. In no sense did Congress mean to encourage fishing expeditions into private behavior. A "professional review action" requires that the record reflect a clear nexus between the basis for an "action" or "recommendation" and a physician's medical practice. 42 U.S.C. § 11151(9). For the statute, notwithstanding its generous protections for peer review, imposes limits on the definition of "professional review action." The statute uses the word "professional" — a term that connotes the opposite of "personal"—and further emphasizes that there are limits on "professional review actions" by explicitly listing bases for actions which are outside of the definition, *see* 42 U.S.C. § 11151(9)(A)-(E),

including "any other matter that does not relate to the compe-tence or professional conduct of a physician." *Id.* at § 11151(9)(E). Defendants' all-encompassing interpretation of the immunity would, like plaintiff's narrow restriction of it, upset the balance Congress struck.

### B.

Both sides therefore advance interpretations that are too rigid—they treat this as an all-or-nothing matter. But we decline to adopt the absolute rule of either side in resolving the matter before us. In this case, there exists a clear nexus between the alleged sexual misconduct and plaintiff's medical practice. We do not infer such a nexus from the representa-tions of the parties, for the record itself demonstrates a con-nection between the basis for plaintiff's suspension and his medical practice such that the hospital legitimately feared for patient well-being. While it would serve the interest of no one to lay bare all the details and disputes surrounding the conduct at issue, the record indicates that WRH suspended plaintiff out of a concern that he might sexually abuse child patients in the course of his practice. As the district court noted, "[t]he office of the clerk of the Family Court had provided Mr. Hales, Chief Executive Officer of the Hospital, with docu-ments regarding the alleged sexual abuse." JA 649. The MEC reviewed materials from DSS evidencing sexual abuse, including the DSS investigation report concluding that there was a preponderance of evidence that plaintiff and his wife had sexually abused the child, drawings by the child, and statements made by the child to her therapist, forensic inter-viewer, and DSS caseworker. JA 905-52. The Hearing Com-mittee Report stated that plaintiff's privileges were suspended based on DSS's sexual abuse allegations, the prior Family Court finding of child abuse and neglect, and "the fact that [plaintiff] has the ability to take care of minor children within the hospital." JA 880. The Hearing Panel emphasized the "in-timate relationship between physician and patient" and its concern for patient safety. JA 881.

Juberg, Hales, and members of the Medical Executive Committee each testified that they were concerned that plaintiff was a threat to patients, most notably children, at the hospital. Even a member of the MEC who did not think plaintiff's suspension was warranted stated that the suspension was not unreasonable because people "were genuinely concerned about the safety and welfare of the children in the community." JA 432. According to Juberg, the hospital considered limiting plaintiff's privileges to adult patients and prohibiting him from treating children, but ultimately didn't adopt this solution because it believed that "with his history of violating hospital policy, and because [WRH is] such a small institution and had really no way of policing or monitoring his goings on," simply limiting plaintiff's privileges "would still not protect the patients at the hospital." JA 707. He emphasized that "[w]e couldn't be sure that he would not have contact with children." *Id.* The same conclusion was reflected in Hales' comment that "[m]y main concern was for children." JA 720. A member of the Board of Directors declared that the "Board felt that upholding the suspension was the only reasonable and prudent option we had to ensure the safety of the patients at the Hospital." JA 838. And at oral argument, plaintiff's counsel confirmed a crucial point: that plaintiff treated children at the hospital.

Certainly the hospital could have considered the relationship between the sexual abuse allegations and plaintiff's pediatric practice with more particularity, but there is ample evidence that those involved in plaintiff's peer review action recognized the potential for plaintiff to harm patients. The hospital feared that child abuse could occur on its watch and therefore was steering between two forms of potential civil liability: liability for child sexual abuse and liability for suspending a physician.

To be sure, there will be close cases surrounding the scope of HCQIA immunity. But that should hardly be surprising. The statutory test that a professional review action must be

"based on the competence or professional conduct of an individual physician (which conduct affects or could affect adversely the health or welfare of a patient or patients)," 42 U.S.C. § 11151(9), presupposes a certain number of close calls. That is the case when any general standard is applied to the particular. But the entire purpose of an immunity provision is to afford some discretionary latitude to decisionmakers to make close calls unhaunted by the specter of civil liability. *See Elder v. Holloway*, 510 U.S. 510, 514 (1994) ("The central purpose of affording public officials qualified immunity from suit is to protect them 'from undue interference with their duties and from potentially disabling threats of liability.'").

It may not help therefore to posit future close hypothetical cases in the abstract, for matters come before decisionmakers in a far more concrete and factually variegated form. No single peer review proceeding precisely replicates another. Moreover, peer reviewers will not as a practical matter be preoccupied with whether something arose in a medical or non-medical setting, but whether it is of a sufficient dimension to plainly affect a doctor's "competence" to practice medicine. In other words, it would prove problematic to chop the statutory standard into judicially fashioned boxes or categories. Rather, we should let the statutory test of "competence" stand simpliciter. In this case, the hospital conducted lengthy proceedings and saw the matter through three levels of review in what was manifestly an effort to determine plaintiff's "competence" to practice medicine. Whether or not we would have made the same decision ourselves is not the point. Any statutory standard inescapably involves some difficult exercises in judgment and to deny decisionmakers the right to exercise judgment in close cases is to defeat the purpose of immunity.

There are of course distinct limits on the scope of HCQIA immunity, but where as here the record reflects a clear nexus between the basis for plaintiff's suspension (evidence of child sexual abuse) and his medical practice (involving children)

such that the hospital legitimately feared that plaintiff might harm child patients, it can be said that the review action was based on plaintiff's "competence" to treat children. 42 U.S.C. § 11151(9). And conversely, it cannot be said that the review action was based on a "matter that does not relate to the competence or professional conduct of a physician." *Id.* at § 11151(9)(E). The hospital's action therefore falls within the scope of HCQIA immunity.

## C.

Having concluded that WRH's action is a "professional review action," we turn to the remaining requirements for HCQIA immunity. There is a statutory presumption that a professional review action meets the requirements for immunity unless the presumption is rebutted by a preponderance of the evidence. 42 U.S.C. § 11112(a).

Under § 11112(a)(1), the review action must be taken "in the reasonable belief that the action was in the furtherance of quality health care." There is ample evidence that WRH took the professional review action to protect child patients from sexual abuse.

Under § 11112(a)(2), the review action must be taken "after a reasonable effort to obtain the facts of the matter." The hospital engaged in a three-tier review of the initial summary suspension (the Medical Executive Committee, the Hearing Panel, and the Board of Directors). At every level, the members reviewed the evidence collected by DSS, heard witnesses, and gave plaintiff an opportunity to present evidence and cross-examine adverse witnesses. In fact, the Hearing Panel held open the record for two months so that plaintiff could present additional evidence, and it ultimately produced a 114-page transcript, 70 pages of exhibits, and a detailed report including findings of fact based on the specific evidence considered. The Board even met twice so that plaintiff could present additional evidence.

Under § 11112(a)(3), the hospital must provide plaintiff "adequate notice and hearing procedures" that are further specified in § 11112(b). WRH satisfied these requirements. Plaintiff contends that WRH did not provide an adequate hearing because members of the Hearing Panel had previously participated in the MEC vote. We reject this argument because it is not based on the statutory requirement, which was satisfied, that the Hearing Panel consist of "individuals who are appointed by the entity and are not in direct economic competition with the physician involved." § 11112(b)(3)(A)(iii). Moreover, plaintiff waived any right to object in this appeal because he did not object to the final composition of the Hearing Panel when it was convened. Plaintiff had previously objected to the initial composition of the Hearing Panel, had been notified of the final panel composition prior to the hearing, and knew firsthand who had participated in the MEC meeting which he had attended. Although he claims to have objected to the Hearing Panel composition at the Board of Director's review of his suspension, he had already waived any right to object by that point.

Under § 11112(a)(4), the review action must be taken "in the reasonable belief that the action was warranted by the facts known." There is evidence that defendants considered the facts and concluded that a suspension was necessary to protect patients due to plaintiff's pediatric practice and the difficulties of limiting his practice to adults. Plaintiff asserts that WRH should have proceeded by administrative suspension and not filed a detrimental report to the NPDB. However, plaintiff does not point to any requirement in HCQIA that a hospital must proceed in such a fashion. Absent such a requirement, where the action is reasonably warranted by the facts and otherwise meets HCQIA standards, it is valid. Administrative suspension simply represents another option for corrective action.

In sum, plaintiff has not met his burden of showing that the requirements in § 11112(a)(1)-(4) were not met. Therefore

HCQIA immunity applies and insulates defendants from plaintiff's state law damages claims.

### III.

We also note as an alternative basis for affirming the judgment that plaintiff's state law claims would fail in any event.

First, plaintiff claims that the hospital's conduct constitutes intentional infliction of emotional distress. This claim fails because the hospital's actions were hardly "so 'extreme and outrageous' so as to exceed 'all possible bounds of decency'" as required to state a claim for IIED. *See Hansson v. Scalise Builders of S.C.*, 650 S.E.2d 68, 70 (S.C. 2007) (quoting *Ford v. Hutson*, 276 S.E.2d 776, 778 (S.C. 1981)). An attempt by the hospital to protect its minor patients, even if ultimately misguided, surely does not "exceed all possible bounds of decency."

Second, plaintiff claims that the hospital's peer review action amounts to tortious interference with plaintiff's existing and prospective contracts with the hospital, patients, and managed care plans. These claims fail because, even if plaintiff established the other elements of the torts, plaintiff has not presented evidence sufficient to establish that defendants' actions were without justification or were for an improper purpose. *See Camp v. Springs Mortgage Corp.*, 426 S.E.2d 304, 305 (S.C. 1993) ("absence of justification" is an element of tortious interference with existing contracts); *Crandall Corp. v. Navistar Int'l Transp. Corp.*, 395 S.E.2d 179, 180 (S.C. 1990) ("improper purpose" or "improper methods" is an element of tortious interference with prospective contracts); *see also* Restatement (Second) Torts § 767 cmt.f (whether interference promotes a "public interest" is a factor to determine whether interference is improper). The action taken here was not without justification nor is the protection of hospital patients an improper purpose. The fact that the hospital also observed HCQIA's safeguards of procedural fairness blunts

plaintiff's claim that any interference with possible contractual relationships was somehow tortious.

Third, plaintiff claims that defendants are liable for defamation. He argues that they knowingly filed a false report with the NPDB because they filed the report under the heading of "sexual misconduct" even though the hospital's action was based on mere allegations. Plaintiff is correct that the "basis for action" was listed as "Sexual Misconduct (D1)," but he fails to mention that this label came from the NPDB list of Basis for Action Codes and was used by the hospital to conform to NPDB formatting requirements. He also takes the phrase out of context. The report provides:

> Description of Act(s) or Omission(s) or Other Reasons for Action Taken: SERIOUS ALLEGATIONS OF SEXUAL MISCONDUCT OF A MINOR CHILD.
>
> Basis for Action: SEXUAL MISCONDUCT (D1)

When read in full, the report accurately states what happened: that the hospital suspended plaintiff's privileges due to serious allegations of sexual misconduct. The label "sexual misconduct" is not false; it is simply the most relevant general reporting category provided by the NPDB. Furthermore, we doubt South Carolina law would deny these defendants a defense of privilege when they could reasonably have believed that they were required by federal law to report plaintiff's suspension. *See* 42 U.S.C. § 11133 (health care entity is required to report "a professional review action that adversely affects the clinical privileges of a physician for a period longer than 30 days"); *see also* 42 U.S.C. § 11137(c) (providing immunity for HCQIA mandated reports made "without knowledge of the falsity of the information contained in the report").

Fourth, plaintiff claims that WRH is liable for violating the hospital bylaws under the theory of breach of contract. Plain-

tiff, however, points us to no South Carolina decision indicating that hospital bylaws create such a contractual relationship. In any event, plaintiff's claimed violation of Article VIII, § 4(a) of the bylaws (that members of the Hearing Panel had already voted on his suspension as members of the MEC) fails because, as discussed, plaintiff waived any rights to contest the composition of the Hearing Panel when he failed to object at the time the Panel was convened. *See Pruitt v. South Carolina Medical Malpractice Liability Joint Underwriting Ass'n*, 540 S.E.2d 843, 845 (S.C. 2001) (waiver can be implied by party's conduct).

Plaintiff also alleges that WRH breached Article VII, § 2 of the bylaws by suspending him when it was not immediately necessary. Section 2 gives the Chairman of the MEC authority to summarily suspend privileges "whenever action must be taken immediately in the best interest of patient care." This claim fails because, given what Juberg knew at the time of his decision and the difficulties of simply limiting plaintiff's practice to adults, it was reasonable for him to believe that he needed to suspend plaintiff's medical privileges to protect patients. For much the same reasons, plaintiff's claim that defendants are liable for these breaches under the theory of promissory estoppel also fails.

Fifth, plaintiff claims that WRH's "negligent sham peer review" violates the South Carolina Unfair Trade Practices Act's prohibition on "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." S.C. Code § 39-5-20(a). This claim fails for several reasons. First, plaintiff has not shown that the peer review was either "an unfair method of competition" or a "deceptive act or practice." The claim also fails because WRH's peer review action was not taken "in the conduct of any trade or commerce" as defined by S.C. Code § 39-5-10(b) since it did not occur in the conduct of "advertising, offering for sale, sale or distribution of any services and any property . . . and any other . . . thing of value." Instead, the peer review action

was an internal hospital review taken to protect patients. *See Foggie v. CSX Transportation, Inc.*, 431 S.E.2d 587, 591 (S.C. 1993) (holding that refusal to reinstall railroad crossing due to concern about crossing accidents was not the "conduct of trade or commerce").

Sixth, plaintiff claims that defendants are liable for civil conspiracy. This claim fails because a civil conspiracy must involve two or more legal entities, *Lawson v. South Carolina Dep't of Corr.*, 532 S.E.2d 259, 261 (S.C. 2000), but defendants are one legal entity when engaging in peer review. *See Oksanen v. Page Mem'l Hosp.*, 945 F.2d 696, 702-03 (4th Cir. 1991) (en banc) (staff members act as agents of the hospital during peer review). Plaintiff has also failed to show how the formal peer review process was "conspiratorial" in any real sense of the word, and plaintiff's allegations that Hales and Juberg were acting independently of the hospital for their own economic interests is on this record little more than speculation.

## IV.

Plaintiff also alleges that WRH is liable for damages under 42 U.S.C. § 1983 for depriving him of his medical practice in violation of the Due Process Clause of the Fourteenth Amendment. HCQIA does not provide immunity from damages for claims made under the Civil Rights Acts. *See* 42 U.S.C. § 11111(a)(1). This claim nonetheless fails for two reasons: (1) plaintiff failed to state a § 1983 claim because WRH's action was not state action,[3] and (2) plaintiff's substantive and procedural due process claims falter on the merits.

---

[3]The same analysis applies to whether an action was taken "under color of state law" as required by § 1983 and whether the action was state action. *See Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 935 (1982).

A.

Plaintiff claims that WRH's suspension of his privileges is state action because the hospital's Board of Directors is nominated by the county delegates to the state legislature and ratified by the Governor; two county representatives are ex-officio members of the Board; the hospital receives state and county funds; and the hospital receives funds through Medicaid and the South Carolina State Plan under Title XIX of the Social Security Act as a public hospital. These facts do not make WRH's suspension of plaintiff's staff privileges state action.

WRH is currently incorporated as a private non-profit corporation under S.C. Code § 33-31-101 *et seq.* Previously, the hospital was Williamsburg County Memorial Hospital and was organized as a tax exempt Regional Health Services District under S.C. Code § 44-7-2010 *et seq.* It became a private hospital on October 1, 2001, when the assets of Williamsburg County Memorial Hospital Public Service District were transferred to defendant corporation WRH in accordance with South Carolina law.[4] *See* S.C. Code § 4-9-82. This does not end our inquiry, however.

---

[4]For this reason, plaintiff's arguments based on statements made prior to October 2001 and those premised on the notion that WRH is a Regional Health Services District are without merit. Plaintiff argues that the reincorporation does not change the status of the District under S.C. Code § 44-7-2130 which provides: "The reincorporation under Article 16, Chapter 7, Title 44 of the 1976 Code of any public hospital corporation that heretofore has been designated as the agency of a county . . . in no way impairs or invalidates this designation and the reincorporated public hospital corporation shall continue as such just as if it had not been so reincorporated." This argument fails because the provision only applies when a District is reincorporated as a "public hospital corporation," *see id.* at § 44-7-2150, and because it only applies to determine whether a District continues to receive special tax revenues from the local government. *Id.* at § 44-7-2130.

Under *Modaber v. Culpeper Mem'l Hosp., Inc.*, 674 F.2d 1023 (4th Cir. 1982), a private entity's action can constitute state action if "'there is a sufficiently close nexus between the State and the challenged action of the regulated entity that the action of the latter may fairly be treated as that of the State itself,'" but "state involvement without state responsibility cannot establish this nexus." *Id.* at 1025 (quoting *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 351, 358 (1974)). The state is deemed responsible for the private entity's action "if the private party acts (1) in an exclusively state capacity, (2) for the state's direct benefit, or (3) at the state's specific behest." *Id.* Applying this framework in *Modaber*, we held that the hospital's receipt of federal Hill-Burton Act funds, its acceptance of Medicare and Medicaid patients, and its obligation to report privileging decisions to the state were not enough to make the state responsible for the hospital's privileging decision under *Jackson*. *Id.* at 1027.

In this case, most of plaintiff's arguments relate to WRH's receipt of government funds through various state and federal programs and therefore do not make WRH's suspension of plaintiff state action under *Modaber*. As noted previously, "the mere fact that the hospitals implement a governmental program does not establish the nexus which *Jackson* requires." *Id.* at 1026.

Plaintiff contends, however, that this case is distinguishable from *Modaber* because government funding is not the only factor that establishes a nexus between WRH's action and the state. Here, in addition, the Board of Directors is nominated by the county delegates to the state legislature and approved by the Governor, and two government officials (the county supervisor and a county representative) serve as ex-officio members of the Board.

These additional facts, however, do not make the state responsible for WRH's privileging decisions. The Governor's involvement with the Board ends after he approves the mem-

bers, and plaintiff has not presented any evidence that the Governor has used his authority to influence privileging decisions. The county representatives may attend the board meetings, but they do not have voting rights and were not present for the consideration of plaintiff's suspension. In fact, the members of the Board who voted were three local bankers and a school principal. Therefore, it cannot be said that the Governor or the county representatives were responsible for WRH's decision to uphold plaintiff's suspension. As in *Freilich*, "the State plays no role whatsoever in the actual decision as to whether or not to terminate or reappoint any particular physician." 313 F.3d at 214 n.3; *see also Watts-Means v. Prince George's Family Crisis Ctr.*, 7 F.3d 40, 43 (4th Cir. 1993) (rejecting argument that county representative on board constituted state action because representative only had one vote and therefore could not determine the board's decision). Therefore, WRH's suspension of plaintiff's privileges is not state action.

## B.

Plaintiff's substantive and procedural due process claims also fail on the merits. Plaintiff claims that WRH violated his substantive due process rights when it suspended his privileges based on "unproven allegations" and therefore is liable for damages resulting from, among other things, his lost practice, loss of reputation and dignity, loss of contracts, and emotional distress. Given the sheer number of tort-like claims plaintiff raises, it is easy to see through his attempt to make an end run around HCQIA immunity by turning § 1983 and the Due Process Clause into the "font of tort law" that the Supreme Court has consistently rejected. *See Paul v. Davis*, 424 U.S. 693, 701 (1976); *Waybright v. Frederick County*, 528 F.3d 199, 204 (4th Cir. 2008) (collecting cases). Moreover, WRH did not just suspend plaintiff on "unproven allegations." WRH engaged in a multi-stage review of evidence including reports from the child's therapist and social worker. Therefore, plaintiff cannot meet the high standard of proving

that WRH's peer review process was "so 'arbitrary' and 'egregious' that it 'shocks the conscience,'" and is "unjustifiable by any government interest." *Waybright*, 528 F.3d at 205 (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 845-49 (1998)).

Plaintiff also alleges that WRH did not provide him adequate procedures when it deprived him of his property right in his medical practice. Plaintiff's claim fails because the procedures WRH afforded him exceed the constitutional threshold established by *Mathews v. Eldridge*, 424 U.S. 319 (1976). Plaintiff was notified of the allegations against him, given ample opportunity to present evidence, allowed to call and cross-examine witnesses, and was represented by counsel throughout. There was no procedural due process violation.

V.

The loss of clinical privileges is no small matter for a physician, but we do not believe the hospital treated it as such. The proceedings here were lengthy and the procedures were fair. Peer review can be a thankless and time-consuming task for those involved, but also one that is necessary to uphold the profession's ultimate obligations not only to its members but to the patients that it serves. To put the parties in this case through further litigation runs the risk of working an injustice of its own, not simply on the individuals involved but on prospective peer reviewers who would henceforth avoid such service at all costs. Such a development would, of course, defeat the entire purpose of the Health Care Quality Improvement Act.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED*.