**J.S., an infant who sues by his next friend and Mother, Deborah M. SIMPSON, Plaintiff,**

v.

**James D. THORSEN, both in his Official Capacity as Executive Director for Facilities and Maintenance for Suffolk Public Schools and in his Individual Capacity, and Terry Napier, aka Fred Die Teryl Napier, both in his Official Capacity as Assistant for Facilities and Maintenance for Suffolk Public Schools and in his Individual Capacity, and Suffolk City School Board, and Deran R. Whitney, Interim Superintendent for Suffolk Public Schools, Defendants.**

Civil Action No. 2:10cv501.

United States District Court,
E.D. Virginia,
Norfolk, Virginia.

Feb. 25, 2011.

David S. Bailey, Esq., for Plaintiff.

Wendell M. Waller, Esq., for Defendant.

## OPINION AND ORDER

MARK S. DAVIS, District Judge.

This matter is before the Court on a Motion to Dismiss Plaintiff's Amended Complaint brought by Defendants James D. Thorsen ("Thorsen"), Terry Napier ("Napier"), Suffolk City School Board ("School Board") and Deran R. Whitney ("Whitney"), pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. After examining the motion, associated briefs, and the Amended Complaint, the Court finds that oral argument would not aid in the decisional process. Fed.R.Civ.P. 78(b); E.D. Va. Loc. R. 7(J). Therefore, the matter is now ripe for decision and, for the reasons set forth below, Defendants' Motion to Dismiss is **GRANTED IN PART** and the case is **REMANDED** to the Circuit Court for the City of Suffolk

for such additional proceedings as it may deem appropriate.

## I. Facts and Procedural History

### A. Facts [1]

#### 1. J.S.' Sickness and the Condition of his School

At age five, in the fall of 2007, J.S. ("Plaintiff" or "J.S.") began attending kindergarten at the Southwestern Elementary School ("School"), a public school in Suffolk, Virginia, operated by the Suffolk City School Board. Am. Compl. ¶ 9. At the time the Plaintiff began attending the School, no one working for Suffolk Public Schools had ever told him or his parents about any existing condition at the School, such as mold or moisture contamination, that might have been harmful to Plaintiff's health. Am. Compl. ¶ 12.

However, from Plaintiff's very first day at the School, he began experiencing sickness that would continue intermittently for the next several years. On that first day, the Plaintiff began vomiting in the classroom and was sent home—where he experienced no further vomiting and appeared to regain his health. Am. Compl. ¶ 13–15. However, once he returned to school several days later, he began to vomit and was sent home once again. Am. Compl. ¶ 16. Upon his return to school a second time, the Plaintiff "began a period of continuous illness ... including sinus infections, skin rashes,[2] watery eyes, ear infections, and repeated vomiting and coughing." Am. Compl. ¶ 17. As a result, Plaintiff missed many days of school during the fall of 2007, and began seeing numerous doctors in an effort to diagnose the cause of his sickness. While the Plaintiff received several diagnoses from multiple sources, his symptoms continued in varying degrees of intensity. In fact, because of the constant vomiting at school, Plaintiff suffered "increasing pressure and ridicule from his classmates." Am. Compl. ¶ 27. "By this time, Plaintiff was rarely able to complete a full week of school without being sent home." Am. Compl. ¶ 26. Although the Plaintiff's condition improved over Christmas break, Am. Compl. ¶ 28, upon his return to School and throughout the second half of the 2007–2008 school year, Plaintiff's sickness continued. While school employees were allegedly aware of Plaintiff's condition, none of them offered Plaintiff's Mother ("Simpson") an explanation. Am. Compl. ¶ 31.

At the end of the 2007–2008 school year, Plaintiff was diagnosed with asthma. Additionally, skin testing revealed that the Plaintiff had an allergic response to mold. Am. Compl. ¶ 39. As a result, the Amended Complaint mentions that Simpson asked an employee of the School District about the environmental conditions of the School. According to the Amended Complaint, on June 23, 2008, Simpson asked

---

1. The facts recited here are drawn from the Plaintiff's Amended Complaint and are assumed true for the purpose of deciding the motion currently before the Court. They are not to be considered factual findings for any purpose other than consideration of the pending motion to dismiss. *See Nemet Chevrolet, Ltd. v. Consumeraffairs.com*, 591 F.3d 250, 255 (4th Cir.2009) ("... in evaluating a Rule 12(b)(6) motion to dismiss, a court accepts all well-pled facts as true and construes these facts in the light most favorable to the plaintiff in weighing the legal sufficiency of the complaint.").

2. While, to many, a rash may have relatively innocuous connotations, these skin rashes were apparently extremely disruptive and painful for the Plaintiff. According to the Amended Complaint, medication, such as hydrocortisone cream, did very little to alleviate the symptoms. Am. Compl. ¶ 31. At one point, the Plaintiff underwent "cryo surgery" in an attempt to freeze the wounds to "seal the wounds and kill the bacteria." Am. Compl. ¶ 36.

Mr. Wheeler ("Wheeler"), a maintenance person at the School, "about conditions in the school, and directly about mold." Am. Compl. ¶ 41. Wheeler replied that "[mold] [has] been a problem at the school for over two years" and his helper has been sick all year. *Id.* Further, Wheeler stated that he hoped J.S. would get better. *Id.* J.S.' health did in fact improve dramatically during the summer. Am. Compl. ¶ 42.

However, the new school year brought a return of Plaintiff's symptoms. By September 15, his sinus infection, vomiting and rash had re-emerged in full force. Am. Compl. ¶ 43–45. These sicknesses continued throughout the fall of 2008, and Simpson continued to ask School officials about the building's condition. During this time, Simpson allegedly discovered that other teachers had expressed concerns about mold. Am. Compl. ¶ 46. On October 14, 2008, Simpson attempted to talk to the School principal about mold testing, Am. Compl. ¶ 48–49, and she was eventually told mold testing would be performed. Am. Compl. ¶ 49.

On October 16, 2008, Simpson learned that people dressed in protective clothing had entered Plaintiff's classroom and re-placed/repaired parts underneath the sink, cleaned or replaced cabinet materials around the sink, and eventually replaced the carpet. Am. Compl. ¶ 50. She later received an email from Plaintiff's teacher stating that "the mold report came back today and my room [Plaintiff's classroom] is mold free." Am. Compl. ¶ 51. Simpson alleges, upon information and belief, that this mold sample was taken by Napier, the Assistant for Facilities and Maintenance for Suffolk Public Schools, who has no formal training in mold sampling, after the room had already been cleaned and re-paired. Am. Compl. ¶ 52. Effectively, she alleges that the cleaning was done in an attempt to "present an altered air sample result," by taking the sample after the

room had been cleaned. *Id.* She further alleges that this "fraudulent sampling is part of a pattern or practice employed by Mr. Napier and others in the School maintenance department to hide mold problems and the underlying excessive moisture conditions that cause such mold problems." Am. Compl. ¶ 53.

Plaintiff continued to attend the School for the remainder of the fall of 2008, and his symptoms did not abate. Am. Compl. ¶ 55. Finally, in January 2009, Plaintiff was conclusively diagnosed with an allergy, not an infectious disease. Am. Compl. ¶ 56. When Simpson went to the School to drop off a letter explaining this diagnosis, she noticed trucks at the School with the names "Marine Chemist" and "Atlantic Environmental." Am Compl. ¶ 57. Inside the School, she observed several rooms blocked off with plastic barriers, as well as "heavy black mold growths on the grout between the cinder block walls in the hallway, black growths around the windows in the cafeteria, and growths around the sinks, pipes and baseboard in the girl's bathroom." *Id.*

In September 2009, Plaintiff started his third year at the School. At that time, Simpson noticed a brand new, bright and clean air conditioning unit in Plaintiff's classroom. Am. Compl. ¶ 60. Additionally, near that time, Simpson asked Wheeler whether the School got "the mold under control over the summer," to which he replied, "I have been cleaning the school all summer. If anything comes of the mold, my job is on the line.... The mold is in the duct work and I can't do anything about the duct work." Am. Compl. ¶ 61. Later in September, 2009, Simpson noticed that the once bright air conditioning unit in Plaintiff's classroom now had "black and green growths all around the vents." Am. Compl. ¶ 62.

On or about October 22, 2009, a doctor confirmed that Plaintiff had a mold allergy and that the School was the source of mold exposure. Am. Compl. ¶ 65. This doctor also prepared a letter for Simpson to bring to the School, requesting a transfer to a different school in the district. Am. Compl. ¶ 66. On October 29, 2009, Simpson delivered this letter to Plaintiff's teacher, the guidance counselor, and the School nurse (who allegedly implied that she had no knowledge of Plaintiff's injury).[3] Am. Compl. ¶ 67. Simpson next met with the School principal, Ms. Harrell, who allegedly told her that she did not know anything about mold or Plaintiff's mold allergy. However, according to the Amended Complaint, Ms. Harrell had signed a mold test request form approximately a year earlier at Simpson's request. Am. Compl. ¶ 69. Ms. Harrell also said that Simpson would need to contact Kevin Alston, the Assistant Superintendent of Suffolk City Schools, regarding any request to transfer Plaintiff's school or additional mold testing. Am. Compl. ¶ 70.

On January 8, 2010, Mr. Alston informed Simpson that he would have the room tested again. Am. Compl. ¶ 75. Later that afternoon, when Simpson went to the School, she noticed the "overwhelming odor of bleach."[4] Am. Compl. ¶ 77. She also observed that the air conditioning unit had been cleaned, the hallways were "nice and white," and a gentleman was cleaning one of the bathrooms. Am. Compl. ¶ 77.

On February 12, 2010, Mr. Alston informed Simpson, by letter, that Mr. Thorsen, the Executive Director of Facilities and Maintenance, had contracted with Marine Chemist Service, Inc. to perform mold testing at the School. Am. Compl. ¶ 78. The letter also stated that the "Marine Chemist report came back with lower mold numbers inside the building than outside" and therefore "he was denying the Simpson request to receive an education outside of the assigned zone." Am. Compl. ¶ 79. According to the Amended Complaint, this mold report stated that the samples had been taken by the "customer." Am. Compl. ¶ 80. The Plaintiff believes that this "customer" was Napier, who took the sample after the bleach cleanup. *Id.* Neither Napier nor Thorsen allegedly have any "formal training in mold sampling" and were "not qualified . . . to collect mold samples, analyze mold test results, or to direct or conduct mold remediation." Am. Compl. ¶ 80A.

Simpson appealed the denial of Plaintiff's transfer to the full School Board, which, on March 12, 2010, approved the transfer. Am. Compl. ¶ 83. However, despite the transfer, the Amended Complaint contends that, as a result of this mold exposure, Plaintiff faces "long term medical treatment and may have suffered permanent immune system and cognitive injury," as well as educational setbacks. Am. Compl. ¶ 84.

### 2. The Alleged Culpability of the Defendants

According to the Amended Complaint, Thorsen, Napier and the School Board "each and all knew that excessive mold and moisture conditions existed at [the School] as such conditions were well-known and discussed within the school system among the School staff and maintenance persons." Am. Compl. ¶ 85. Additionally, all of the parties allegedly had been informed that "continued complaints regarding the mold and moisture conditions would necessitate a more comprehen-

---

**3.** Despite such denial, the nurse allegedly later asked Simpson if she knew anything about "sick buildings." Am. Compl. ¶ 71. .

**4.** According to the Amended Complaint, bleach is not recommended to clean mold conditions, as it may increase the danger of dispersal of mold spores. Am. Compl. ¶ 77a.

sive investigation." Am. Compl. ¶ 86. Moreover, the Amended Complaint asserts that Thorsen and Napier, "knew that the mold sampling technique employed by them at the School was not representative of conditions, was not proper, and was misleading." Am. Compl. ¶ 86a. The Plaintiff further alleges that Thorsen and Napier knew the Plaintiff had been sick, "yet withheld all mold test results from Plaintiff's Mother, and manipulated or outright falsified mold test results." Am. Compl. ¶ 87. Plaintiff claims that all of this occurred, despite a seminar the School Board allegedly received in 2001, where it was "instructed about mold generally, about industry standards for testing and remediation, and about the health dangers of letting mold grow." Am. Compl. ¶ 88.

### B. Procedural History

Plaintiff originally filed a Complaint initiating the current lawsuit in the Circuit Court for the City of Suffolk, Virginia. This Complaint alleged a total of ten counts against Thorsen, Napier, the Suffolk City School Board, and Deran R. Whitney, Interim Superintendent for Suffolk Public Schools, although not all claims were asserted against all Defendants. Among these ten claims were four constitutional claims brought under section 1983 of the Civil Rights Act of 1871. *See* 42 U.S.C. § 1983. Count I was a *"Monell* Claim," alleging the School Board is liable for promulgating a custom or policy that led to a violation of the Plaintiff's due process rights under the Fourteenth Amendment to the United States Constitution. *See* U.S. Const. amend. XIV, § 1. Count II also sought to impose liability on the School Board under § 1983, but that claim was not premised on a custom or policy that violated the Plaintiff's due process rights, but rather on the premise that the School Board, as a state actor, directly created the dangerous situation that resulted in the Plaintiff's injuries, resulting in a deprivation of due process rights.

Counts VI and VII of the Complaint were substantially similar to Counts I and II, however, Counts VI and VII alleged due process violations against Thorsen and Napier rather than the School Board.

In light of the Plaintiff asserting federal causes of action under § 1983, on October 8, 2010, the Defendants filed a Notice of Removal, removing the case to federal court. On October 13, 2010, Defendants filed a Motion to Dismiss the action under Rule 12(b)(6) of the Federal Rules of Civil Procedure. In response, on October 22, 2010, Plaintiff filed an Amended Complaint pursuant to Rule 15(a)(1)(B) of the Federal Rules of Civil Procedure.

Much like the first Complaint, the Amended Complaint asserts ten causes of action against the Defendants. Count I asserts a cause of action against the School Board under 42 U.S.C. § 1983, alleging the School Board violated Plaintiff's "liberty interest in bodily integrity," which is constitutionally protected under the Due Process Clause of the Fourteenth Amendment. Am. Compl. ¶ 108. This claim is referred to as a *"Monell* Claim" because it is based on the assertion that the School Board adopted policies and customs, and failed to train its employees, resulting in a deprivation of the Plaintiff's due process rights. In Count II, the Plaintiff asserts a second constitutional claim against the School Board grounded on the theory that the School Board "created the dangerous situation that resulted in the Plaintiff's injuries." Am. Compl. ¶ 117. Counts III, IV, and V allege state law claims of fraud, gross negligence, and negligence against the School Board stemming from its conduct regarding the condition of the School.

Counts VI and VII, asserted by the Plaintiff, are constitutional claims that are substantially similar to Counts I and II. However, these counts are asserted against James D. Thorsen, Executive Di-

rector for Facilities and Maintenance for Suffolk Public Schools, and Terry Napier, Assistant for Facilities and Maintenance for Suffolk Public Schools, in both their individual and official capacities. Similarly, Counts VIII, IX, and X assert state law claims of fraud, gross negligence, and negligence against those two individuals, also in their individual and official capacities. The Court also notes that, although Whitney is named as a Defendant, there are no counts specifically asserted against him. He is "named in this action only for the purpose of implementing the orders of this Court." Am. Compl. ¶ 7.

In response to the Amended Complaint, on October 27, 2010, Defendants filed a second Motion to Dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure. It is this motion that the Court addresses below.

## II. Standard of Review

Federal Rule of Civil Procedure 12(b)(6) permits a defendant to seek dismissal based on the plaintiff's "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). A court considering a motion to dismiss filed pursuant to Rule 12(b)(6) must assess the legal sufficiency of the allegations in the plaintiff's complaint. *Francis v. Giacomelli*, 588 F.3d 186, 192 (4th Cir.2009). A motion to dismiss for failure to state a claim should be granted if the complaint does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). Requiring a claim be plausible does not impose a probability requirement at the pleading stage. *Id.* at 556, 127 S.Ct. 1955. However, it does ask for more than a "sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, —— U.S. ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the

court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

A 12(b)(6) motion tests the sufficiency of a complaint and "does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir.1992). Accordingly, a court should "assume the truth of all facts alleged in the complaint and the existence of any fact that can be proved, consistent with the complaint's allegations." *E. Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir.2000). Although the truth of the facts alleged is assumed, courts are not bound by the "legal conclusions drawn from the facts" and "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." *Id.*

A motion to dismiss pursuant to Rule 12(b)(6) must be read in conjunction with Federal Rule of Civil Procedure 8(a)(2). Rule 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R.Civ.P. 8(a)(2), so as to "... give the defendant fair notice of what the ... claim is and the grounds upon which it rests...." *Bell Atl. Corp.*, 550 U.S. at 555, 127 S.Ct. 1955 (quoting *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). Fair notice is provided by setting forth enough facts for the complaint to be "plausible on its face" and "raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)...." *Id.* at 555, 127 S.Ct. 1955 (internal citations omitted). "Rule 12(b)(6) does not countenance ... dismissals based on a judge's disbelief of a complaint's factual allegations." *Id.* at 556, 127 S.Ct. 1955 (quoting *Neitzke v. Williams*, 490 U.S. 319, 327, 109 S.Ct. 1827, 104 L.Ed.2d 338

(1989)). A complaint may therefore survive a motion to dismiss "even if it appears 'that a recovery is very remote and unlikely.'" *Id.* (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)).

Where a motion to dismiss is filed with respect to a civil rights claim, the Court "must be 'especially solicitous' of the wrongs alleged." It "must not dismiss the complaint 'unless it appears to a certainty that the plaintiff would not be entitled to relief under any legal theory which might plausibly be suggested by the facts alleged.'" *Harrison v. U.S. Postal Serv.,* 840 F.2d 1149, 1152 (4th Cir.1988)(internal citation omitted).

### III. Discussion

#### A. Count I—"Monell Claim"

In Count I, Plaintiff asserts a *"Monell* Claim" against the School Board under 42 U.S.C § 1983.[5] Under 42 U.S.C. § 1983, an individual may maintain a private right of action for a violation of constitutional due process rights under color of state law. According to that statute:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

42 U.S.C. § 1983. "When a § 1983 claim is asserted against a municipality, two issues must be determined: '(1) whether plaintiff's harm was caused by a constitutional violation, and (2) if so, whether the city is responsible for that violation.'" *Covenant Media of S.C., L.L.C. v. City of N. Charleston,* 493 F.3d 421, 436 (4th Cir. 2007) (quoting *Collins,* 503 U.S. at 120, 112 S.Ct. 1061).

"The *Monell* framework applicable to government entity (or official capacity) liability bears on whether a government entity is sufficiently responsible for a constitutional deprivation to hold the entity liable under § 1983; *Monell* does not bear on whether there has been a constitutional deprivation in the first place." *Robertson v. Elliott,* 315 Fed.Appx. 473, 476 (4th Cir.2009)(unpublished). Moreover, if there are "no underlying constitutional violations by any individual, there can be no municipal liability." *Grayson v. Peed,* 195 F.3d 692, 697 (4th Cir.1999). *See Collins,* 503 U.S. at 122, 112 S.Ct. 1061 ("Our purpose in citing these cases is to emphasize the separate character of the inquiry into the question of municipal responsibility and the question whether a constitutional violation occurred."); *Hinton v. Hearns,* No. 1:08cv608, 2008 WL 2662974, at *3, 2008 U.S. Dist. LEXIS 50768, at *11 (E.D.Va. July 2, 2008) (emphasis added) (holding that in order to find municipality liability under *Monell,* "[p]laintiff must therefore allege facts sufficient to show three elements: (1) the existence of an official policy or custom (2) that is fairly attributable to the municipality (3) that proximately

---

5. Such a claim derives its name from a 1978 Supreme Court case, styled *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). The issue in *Monell* was whether a municipality could be held liable for constitutional violations under 42 U.S.C. § 1983. There, "the Court held that Congress intended municipalities and other local gov-

ernment entities to be included among those persons to whom § 1983 applies." *Collins v. City of Harker Heights,* 503 U.S. 115, 120, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992). Such local government entities also include school boards. *Monell,* 436 U.S. at 662–63, 98 S.Ct. 2018.

caused *the underlying constitutional violation.*").

If the Court determines that there has been an underlying constitutional violation, it must then proceed to step two in the analysis—determining whether the municipality is liable for that violation. A municipality's liability "arises only where the constitutionally offensive actions of employees are taken in furtherance of some municipal policy or custom." *Walker v. Prince George's Cnty.,* 575 F.3d 426, 431 (4th Cir.2009) (internal quotations omitted). "Section 1983 plaintiffs seeking to impose liability on a municipality must, therefore, adequately plead and prove the existence of an official policy or custom[6] that is fairly attributable to the municipality and that proximately caused the deprivation of their rights." *Jordan by Jordan v. Jackson,* 15 F.3d 333, 338 (4th Cir.1994). Furthermore, municipality liability under *Monell* cannot be premised on a theory of respondeat superior or vicarious liability, but rather, "[i]t is only when the execution of the government's policy or custom ... inflicts the injury that the municipality may be held liable under § 1983." *City of Canton v. Harris,* 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989) (quoting *Springfield v. Kibbe,* 480 U.S. 257, 267, 107 S.Ct. 1114, 94 L.Ed.2d 293 (1987) (O'Connor, J., dissenting)) (internal quotations omitted).

The Plaintiff's allegations in Count I describe, in detail, the customs, policies or failures on the part of the School Board that allegedly impute liability to the School Board. Count I alleges that the School Board deprived Plaintiff of his liberty interest in bodily integrity by: (1) allowing untrained school personnel to perform mold sampling, an endeavor that requires specialized skill and training; (2) allowing untrained personnel to perform mold remediation in a manner that diverges from the proper industry protocol; (3) failing to train School Board employees on the appropriate response to the presence of mold in the School; (4) concealing from the Plaintiff the excessive moisture and mold conditions in the School, resulting in the concealment of a dangerous health condition; and (5) promulgating a policy, custom, or procedure that knowingly failed to adequately identify the seriousness of the mold conditions in the School. Am. Compl. ¶ 108. However, while all of these customs, policies, and failures to train might be potentially actionable in the constitutional sense, they are only actionable if they "proximately caused the underlying constitutional violation." *Hinton,* 2008 WL 2662974, at *3, 2008 U.S. Dist. LEXIS at *11. Therefore, the Court must first determine if an underlying constitutional violation has been adequately pled in the Amended Complaint.

██ Counts I and II assert causes of action against the School Board, whereas Counts VI and VII assert causes of action against Thorsen and Napier. The § 1983 claims against Thorsen and Napier are "the gateway to all the other § 1983 claims, for supervisors and municipalities cannot be liable under § 1983 without some predicate 'constitutional injury at the hands of the individual [state] officer,' at least in suits for damages." *Waybright v. Frederick Cnty., Md., Dep't of Fire & Rescue Servs.,* 528 F.3d 199, 203 (4th Cir.2008) (alteration in original). In this case, the

---

**6.** In the Plaintiff's Amended Complaint, in addition to alleging a "custom and policy" that led to constitutional violations, he also alleges a "failure to train." On this subject, the Supreme Court has stated "if a city employee violates another's constitutional rights, the city may be liable if it had a policy or custom of failing to train its employees and that failure to train caused the constitutional violation." *Collins,* 503 U.S. at 123, 112 S.Ct. 1061.

individual constitutional wrong alleged is that Thorsen and Napier deprived Plaintiff of his "constitutionally protected liberty interest in bodily integrity"—which is a substantive due process claim. Am. Compl. ¶ 172; *Waybright*, 528 F.3d at 204. "If this allegation survives scrutiny, we go to the others; if not, the federal side of this case comes to a close." *Waybright*, 528 F.3d at 204. As a result, the Court will first turn to Count VII, to assess whether any of the allegations asserted against Thorsen and Napier, rise to the level of a constitutional violation. If the Plaintiff has alleged a plausible constitutional violation, the Court will then turn back to Counts I and II to determine whether the Plaintiff has pled sufficient facts to plausibly impute liability to the School Board.

### B. Count VII—Violation of the Due Process Clause

#### 1. The Facts Alleged and The Basis of a Due Process Claim

The Fourteenth Amendment to the United States Constitution provides that a state shall not "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. This clause recognizes two distinct categories of rights—procedural rights and substantive rights. *See, e.g., Weller v. Dep't of Soc. Servs.*, 901 F.2d 387, 391 (4th Cir.1990). While procedural due process simply guarantees fair procedures—typically notice and opportunity to be heard, when constitutional interests are implicated, *Mora v. City of Gaithersburg*, 519 F.3d 216, 230 (4th Cir.2008), substantive due process protections guard against "state action so arbitrary and irrational, so unjustified by any circumstance or governmental interest, as to be literally incapable of avoidance by any pre-deprivation procedural protections or of adequate rectification by any post-deprivation state remedies."

*Rucker v. Harford Cnty.*, 946 F.2d 278, 281 (4th Cir.1991).

Count VII asserts a litany of behavior that the Plaintiff alleges violated his constitutionally protected substantive due process rights under the Fourteenth Amendment. According to the Amended Complaint, by taking the following actions, Thorsen and Napier created a "dangerous situation that resulted in Plaintiff's injuries," Am. Compl. ¶ 171, and/or "used their authority in a way that rendered Plaintiff more vulnerable to danger than had defendants not acted at all thereby violating Plaintiff's substantive due process rights of constitutionally protected liberty interest in bodily integrity." Am. Compl. ¶ 172. These actions consist of: (1) "engaging in mold investigations, knowing they were untrained and unqualified in such acts;" (2) "engaging in mold remediation, utilizing bleach and other biocides in an attempt to perform mold remediation, knowing they were untrained and unqualified in such acts ...;" (3) "concealing from Plaintiff the excessive moisture and mold conditions;" (4) "delaying the mold sampling;" and (5) performing "pre-sampling cleaning to mask moisture and mold conditions." Am. Compl. ¶¶ 172, 167. This behavior allegedly-occurred after the School Board, Thorsen, and Napier had been informed of the hazards of mold and moisture conditions, and the proper protocols for dealing with such problems, Am. Compl. ¶ 165, all while Thorsen and Napier allegedly knew that employees and students were suffering health effects consistent with exposure to such conditions. Am. Compl. ¶ 166. As a result, the Amended Complaint alleges that the Defendants were "recklessly, willfully, and deliberately indifferent to the health, safety, and well-being of Plaintiff" in "conscious and deliberate disregard of the substantial and/or unjustifiable risk of causing harm ... to Plaintiff." Am. Compl. ¶ 169. With these allegations in mind, we now

turn to the protections afforded by the Constitution.

■ "The Fourteenth Amendment's Due Process Clause protects a set of interests—life, liberty, and property—that are also protected by state tort law. Together with § 1983, then, there is some risk of the Clause supplanting state tort law in almost any suit alleging that a local official has caused harm." *Waybright,* 528 F.3d at 204. The Supreme Court has therefore taken a cautious approach to such claims. *Id.* In distinguishing between actions that rise to the level of a constitutional injury and those that are more akin to a state tort action, the Supreme Court stated that the Clause, at its core, "combats 'arbitrary action' of government." *Id.* (quoting *County of Sacramento v. Lewis,* 523 U.S. 833, 845, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998)). It does not apply to ordinary governmental neglect, bad policy or inaction, but rather "only the most egregious official conduct can be said to be arbitrary in the constitutional sense." *Id.* (citation omitted).

This standard is high because "[i]n case after case, the Supreme Court has ... spurned any approach to the *Fourteenth Amendment* that would make it 'a font of tort law to be superimposed upon whatever systems may already be administered by the States.'" *Id.* (quoting *Paul v. Davis,* 424 U.S. 693, 701, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976)). "[T]he due process guarantee does not entail a body of constitutional law imposing liability whenever someone cloaked with state authority causes harm," *Lewis,* 523 U.S. at 848, 118 S.Ct. 1708, and therefore, the Due Process Clause should not be "interpreted to impose federal duties that are analogous to those traditionally imposed by state tort law." *Collins,* 503 U.S. at 128, 112 S.Ct. 1061.

As the Fourth Circuit noted in *Waybright,* two guiding principles can be gleaned from Supreme Court jurisprudence regarding the reach of the Due Process Clause with respect to executive action by a state official. First, meritorious due process claims are those that "involv[e] a certain sense of constitutional magnitude." *Waybright,* 528 F.3d at 204. Since "applying the Clause to the ordinary run of governmental neglect, inaction, and bad policy would diminish it," the courts should apply the Due Process Clause to cases that involve " 'only the most egregious official conduct.'" *Id.* (quoting *Lewis,* 523 U.S. at 846, 118 S.Ct. 1708). Second, the Fourth Circuit notes that every extension of the Due Process Clause necessarily implicates a "concern for the authority of state governments over areas traditionally assigned to state law." *Id.* at 205. "[D]ecisions about how to allocate resources in state government 'involve a host of policy choices that must be made by locally elected representatives, rather than by federal judges interpreting the basic charter of Government for the entire country.'" *Id.* (quoting *Collins,* 503 U.S. at 129, 112 S.Ct. 1061).

In light of these principles, the Fourth Circuit has repeatedly held that conduct that is "wrong enough to register on a due process scale" is conduct that " 'shocks the conscience,' and nothing less." *Id. See Patten,* 274 F.3d at 834 ("The substantive component of the due process clause protects against only the most egregious, arbitrary governmental conduct-that is, conduct that can be said to 'shock[ ] the conscience.' "). Determining whether conduct shocks the conscience turns on the degree of fault on the part of the actor imposing the harm. *Waybright,* 528 F.3d at 205.

In evaluating substantive due process claims, the Fourth Circuit has held that fault can generally be classified into three broad categories for due process purposes.

First, "negligently inflicted harm" is "categorically beneath the threshold of constitutional due process." *Id.* (quoting *Lewis,* 523 U.S. at 849, 118 S.Ct. 1708). As to the second, or middle, ground, culpability that falls between negligence and intentional conduct, such conduct "may have constitutional implications, but only in *special circumstances.*" *Id.* (emphasis added) Third, the type of conduct that is most likely to have due process implications because it shocks the conscience is conduct "intended to injure in some way unjustifiable by any government interest." *Id.* Therefore, in order to determine whether a Due Process violation has been plausibly alleged, the Court must classify the nature of the conduct asserted in the Amended Complaint.

### 2. The Two Extremes—Negligence and Intentional Conduct

Since the Fourth Circuit has unequivocally stated that the first category of fault, negligently inflicted harm, does not rise to the level of a constitutional due process violation, the Court need not address any claims that could be classified as mere negligence on the part of the Plaintiff. While the Court would normally next consider the second category of fault, asking whether there are allegations of culpability falling between negligence and intentional conduct that constitute "special circumstances," it will first examine the third category of fault to determine whether the Plaintiff has alleged intentional conduct amounting to a substantive due process violation.

▇▇▇ Recognizing that this third category of fault reflects the paradigmatic substantive due process violation, "the general rule is that the action must have been 'intended to injure in some way unjustifiable by any government interest.'" *Id.*

(quoting *Lewis,* 523 U.S. at 849, 118 S.Ct. 1708). The Plaintiff's Amended Complaint contains a host of allegations asserting intentional conduct on the part of Thorsen and Napier, but it does not plausibly allege intentional conduct *intended to injure.* According to the allegations, Thorsen and Napier knowingly: (1) performed pre-sampling cleaning to mask moisture and mold conditions, Am. Compl. ¶ 167, even though they knew staff, teachers, and students were suffering adverse health effects from mold and moisture, Am. Compl. ¶ 166; (2) performed mold investigation without proper training, Am. Compl. ¶ 172(a); (3) engaged in improper mold remediation, Am. Compl. ¶ 172(b); (4) concealed from the Plaintiff the harmful conditions of the School, Am. Compl. ¶ 173(c); and (5) delayed the mold sampling, Am. Compl. ¶ 173(d).

Even when viewed in the light most favorable to the Plaintiff, as the Court must at the motion to dismiss stage, these allegations cannot be construed as stating a plausible claim of conduct *intended to injure.* In Plaintiff's Amended Complaint, Plaintiff alleges that the Defendants acted "recklessly, willfully, and deliberately indifferent to the health, safety, and well-being of Plaintiff" with a "conscious and deliberate disregard of the substantial and/or unjustifiable risk of causing harm...." Am. Compl. ¶ 169. At most, the Amended Complaint alleges that Thorsen and Napier intentionally misled the Plaintiff with respect to the mold conditions and intentionally engaged in substandard remediation. While this conduct may amount to gross negligence with respect to the Plaintiff's health, such an allegation does not rise to the level of conduct "intended to injure." [7] As a result, the

---

7. In the Plaintiff's Memorandum in Opposition to Defendants' Motion to Dismiss, Plaintiff states that his claim is grounded in the line of cases that have held the liberty interest

in bodily integrity is "violated when a child is molested by a government employee." Pl's Br. 3. In support this contention, Plaintiff

Plaintiff has not alleged a plausible substantive due process violation under the third category of fault, which requires that the action was "intended to injure."

■ The Court must therefore turn to the second, or middle, ground of culpability—culpability "following from something more than negligence but less than intentional conduct," *Waybright*, 528 F.3d at 205—to determine if the facts alleged in this case fall within "special circumstances," and thereby potentially shock the conscience, implicating the Due Process Clause of the United States Constitution. Therefore, gross negligence or recklessness alone are not sufficient to implicate the Due Process Clause. The Due Process Clause is only implicated if gross negligence or recklessness occur in "special circumstances." *Id.* (quoting *Lewis*, 523 U.S. at 849, 118 S.Ct. 1708) ("And as to 'culpability falling within the middle range, following from something more than negligence but less than intentional conduct,' the Court has allowed that it may have constitutional implications, but only in special circumstances.").

### 3. Special Circumstances

Although it is not always simple to discern whether fault is "negligent" or "intentional," the real "difficulty comes in determining 'whether the point of the conscience shocking is reached when injuries are produced with culpability falling within the middle range, following from something more than negligence but less than intentional conduct, such as recklessness or gross negligence.'" *Patten*, 274 F.3d at 834 (quoting *Lewis*, 523 U.S. at 849, 118 S.Ct. 1708). Culpability in the middle ground can rise to the level of being conscience shocking only in contexts described as "special circumstances." *Waybright*, 528 F.3d at 205. The Court therefore turns to the content of the relationship alleged to determine whether "special circumstances" exist.

■ In evaluating whether special circumstances exist, courts must make "'an exact analysis' of the circumstances presented 'before any abuse of power is condemned as conscience shocking.'" *Id.* (quoting *Lewis*, 523 U.S. at 850, 118 S.Ct. 1708). However, in this analysis, the Fourth Circuit has cautioned against an overreaching application of the Due Process Clause. Since the *"Fourteenth Amendment's Due Process Clause* protects a set of interests—life, liberty, and property—that are also protected by state tort law," *Id.* at 204, "courts should exercise 'judicial self-restraint' and 'utmost care' in novel substantive due process cases." *Id.* As a result, there is a *"strong presumption* that § 1983 due process claims which overlap state tort law should be rejected and the case, if diversity is lacking, sent to state court." *Id.* at 205 (emphasis added). After all, "[t]he Fourteenth Amendment is

cites the Seventh Circuit case of *Wragg v. Village of Thornton*, 604 F.3d 464 (7th Cir. 2010). In that case, the Village fire chief molested a sixteen-year-old boy in the Village's fire cadet program. *Id.* at 466. However, such facts are inapposite to the facts in the present case because the molestation of a child necessarily connotes an intentional act designed to injure the child, which the Plaintiff has not plausibly alleged here.

Additionally, the Plaintiff cites *Shillingford v. Holmes*, 634 F.2d 263, 265 (5th Cir.1981), for the proposition that "[t]he right to be free

of state-occasioned damage to a person's bodily integrity is protected by the fourteenth amendment guarantee of due process." However, like *Wragg*, that case involved a police officer *intentionally* striking the victim with a nightstick. While the Plaintiff's brief classifies Defendants' conduct as intentionally harming Plaintiff, Pl. Br. 5, the Court cannot glean any plausible intention to injure from the Amended Complaint's allegations. At most, the Amended Complaint alleges gross negligence or recklessness with respect to the health of the Plaintiff.

a part of a Constitution generally designed to allocate governing authority among the Branches of the Federal Government and between that Government and the States, and to secure certain individual rights against both State and Federal Government." *Daniels v. Williams*, 474 U.S. 327, 332, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). Therefore, "[w]hen dealing with a claim that such a document creates a right ... to sue a government official" for conduct such as that asserted here, "we must never forget, that it is a *constitution* we are expounding," and this "Constitution deals with the large concerns of the governors and the governed, but it does not purport to supplant traditional tort law in laying down rules of conduct to regulate liability for injuries that attend living together in society." *Id.* (quoting *McCulloch v. Maryland*, 17 U.S. 316, 407, 4 Wheat. 316, 4 L.Ed. 579 (1819)) (emphasis in original).

### a. Special Relationship

The Fourth Circuit has recognized that a special circumstance can arise where there is a "special relationship." *Waybright*, 528 F.3d at 207. When the state is in a special relationship with a private individual, "it acquires a duty to act on that individual's behalf and its failures to act are measured on a deliberate indifference standard"—which may result in a finding of a due process violation. *Id.* A "'special relationship' is all but synonymous with a custodial relationship." *Id.* (citing *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 199–200, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989)). As an example, "that is why a conscious disregard of the rights of prisoners, pretrial detainees, and committed mental patients

have traditionally been examined for deliberate indifference." *Id.* This requirement that a state affirmatively act for the safety of a private individual in these contexts is grounded in the premise that by taking custody of a person, the state has denied that individual the opportunity to provide for his own needs. According to the Supreme Court,

> when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by ... the Due Process Clause.

*DeShaney*, 489 U.S. at 200, 109 S.Ct. 998.

■ The Fourth Circuit has held that this type of special relationship based on custody only comes about in a factual situation similar to "incarceration, institutionalization, or the like." *Pinder v. Johnson*, 54 F.3d 1169, 1175 (4th Cir.1995) (en banc) ("Some sort of confinement of the injured party—incarceration, institutionalization, or the like—is needed to trigger the affirmative duty."). The affirmative duty to protect does not arise merely "from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf." *Id.* (quoting *DeShaney*, 489 U.S. at 200, 109 S.Ct. 998). The question presented here is whether the School Board is in a special relationship with Plaintiff that is "like" incarceration or institutionalization.

The relationship between Plaintiff and the School Board is grounded in Virginia's school attendance statute.[8] However, de-

---

8. According to the Code of Virginia, "[e]xcept as otherwise provided in this article, every parent, guardian, or other person in the Commonwealth having control or charge of any child who will have reached the fifth birthday

... shall ... send such child to a public school or to a private, denominational, or parochial school or have such child taught by a tutor or teacher of qualifications prescribed by the Board of Education and approved by

spite the fact that Virginia's school attendance laws impose some limit on a student's freedom to act on his own behalf, the Fourth Circuit, in an unpublished decision, has joined other circuits in finding that such a relationship between the school and the pupil does not create a special relationship sufficient to trigger the substantive protections of the due process clause. *See Stevenson v. Martin Cnty. Bd. Of Educ.,* 3 Fed.Appx. 25, 31 (4th Cir.2001) *cert. denied,* 534 U.S. 821, 122 S.Ct. 54, 151 L.Ed.2d 23 (2001) (unpublished) (holding that since "[a]ttending school is not the equivalent of incarceration or institutionalization," there is no special relationship formed between a student and a public school that implicates the Due Process Clause). *See also D.R. v. Middle Bucks Area Vocational Technical Sch.,* 972 F.2d 1364, 1373 (3d Cir.1992); *Doe by Doe v. Hillsboro Indep. Sch. Dist.,* 113 F.3d 1412, 1415 (5th Cir.1997); *McQueen v. Beecher Cmty. Schs.,* 433 F.3d 460, 464 n. 4 (6th Cir.2006); *J.O. v. Alton Cmty. Unit Sch. Dist. 11,* 909 F.2d 267, 272–73 (7th Cir. 1990); *Lee v. Pine Bluff. Sch. Dist.,* 472 F.3d 1026, 1030 (8th Cir.2007); *Maldonado v. Josey,* 975 F.2d 727, 733 (10th Cir.1992); *B.M.H. v. School Bd. Of City of Chesapeake,* 833 F.Supp. 560, 571 (E.D.Va.1993) ("Even if public schools have some duty under state law to protect students, that is not enough to place the affirmative burdens of the Fourteenth Amendment Due Process Clause upon teachers, principals, and administrators to protect each child from possible harm by third parties.").

Therefore, since no "special relationship" exists in this context, the Defendants have not committed a substantive due process violation by failing to affirmatively act to protect J.S. from harm allegedly caused by mold under a special relationship theo-

ry. However, the analysis does not end here because the Plaintiff also asserts the presence of behavior that he contends elevates the Defendants' conduct to a substantive due process violation—the failure to protect from a "state—created danger." Am. Compl. ¶¶ 171, 172.

### b. *State–Created Danger*

According to the Plaintiff's Amended Complaint, "Defendants, acting under color of law, through the conduct alleged above, affirmatively exercised their authority in a manner that created a danger to the Plaintiff." Am. Compl. ¶ 172. The Amended Complaint further alleges that "[t]he Defendants themselves created the dangerous situation that resulted in Plaintiff's injuries." Am. Compl. ¶ 171.

The state-created danger doctrine has its origins in the Supreme Court's decision in *DeShaney.* There, Chief Justice Rehnquist stated,

> [w]hile the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them. That the State once took temporary custody of Joshua does not alter the analysis, for when it returned him to his father's custody, it placed him in no worse position than that in which he would have been had it not acted at all. . . .

*DeShaney,* 489 U.S. at 201, 109 S.Ct. 998. This passage implies that had the state placed him in a worse position by acting, such conduct might implicate Joshua's substantive due process rights. Grounded in this passage, the state-created danger doctrine has "developed as an exception to the general rule that 'a State's failure to pro-

---

the division superintendent, or provide for home instruction of such child. . . ." Va.Code.

Ann. § 22.1–254.

tect an individual against private violence simply does not constitute a violation of the *Due Process Clause.*'" *Holloway v. City of Suffolk,* 660 F.Supp.2d 693, 698 (E.D.Va.2009) (quoting *DeShaney,* 489 U.S. at 197, 109 S.Ct. 998). Although the Fourth Circuit has recognized the existence of the state-created danger doctrine, it has not, to this Court's knowledge, been faced with a set of facts justifying its application. Therefore, the Court will examine the claim in light of existing Supreme Court and Fourth Circuit precedent.

Under the state-created danger doctrine, "[w]hen the state itself creates the dangerous situation that resulted in a victim's injury, the absence of a custodial relationship may not be dispositive." *Pinder,* 54 F.3d at 1177. "At some point on the spectrum between action and inaction, the state's conduct may implicate it in the harm caused...." *Id.* at 1175. "In such instances, the state is not merely accused of a failure to act; it becomes much more akin to an actor itself directly causing harm to the injured party." *Id.* at 1177 In those situations, even though there is no "custodial relationship" between the state and the injured private individual, the state's conduct creates in it a duty to protect the private individual from harm. *Id.*

Therefore, the Fourth Circuit recognized in *Pinder* that even though the Due Process Clause only acts as a negative prohibition on state action and does not create a duty for the state to affirmatively act, the state may, in certain circumstances, take action that creates a ripe environment for harm to such an extent that, if the state does not take sufficient action to prevent the harm, it can be considered to have affirmatively caused the harm itself, thus implicating the Due Process Clause. Such factual scenarios subject governmental entities to claims that are tantamount to a claim that the state

"directly caused harm to the plaintiff." *Pinder,* 54 F.3d at 1176 n. *. We now turn to the allegations in the Amended Complaint to determine whether the state-created danger doctrine applies in this case.

#### i. Analysis

■ For the following reasons, the Court concludes that the state-created danger doctrine does not extend to the facts of this case.

#### (a). *Waybright Addressed the Doctrine in the School Setting*

In *Waybright,* the Fourth Circuit was faced with the question of whether a Plaintiff could prevail on a substantive due process theory when injured in a state-operated workplace. The Plaintiffs (parents of Waybright, who "died by accident while training to join the Frederick County Fire Department in Maryland") alleged that the state actor "'used his authority to create an opportunity for danger that otherwise would not have existed' and thereby knowingly put Waybright in harm's way." *Waybright,* 528 F.3d at 207 (quoting *Rivas v. City of Passaic,* 365 F.3d 181, 194 (3d Cir.2004)). The Fourth Circuit held that such an allegation did not rise to the level of a substantive due process violation in light of the Supreme Court's decision in *Collins,* where it held, according to the Fourth Circuit, "that due process does not impose a duty on municipalities to provide their employees with a safe workplace or warn them against risks of harm (although state tort law may)." *Id.*

In analyzing *Collins,* the Fourth Circuit noted that the Supreme Court's underlying concern "was that constitutional law would push state tort law aside whenever a state or local government acted as an employer." *Id.* at 208. However, even though the facts in *Waybright* dealt solely with the state acting as an employer, the

Fourth Circuit expressed concern for any theory of substantive due process rights that "would potentially set up a federal question whenever an accident happens during activities sponsored by the state." *Id.* The Court stated that if substantive due process rights were to extend to accidents happening during state sponsored activities, federal authority might well be injected "into public school playground incidents, football (or even ballet) practice sessions, and class field trips...." *Id.* Such an extension of due process rights was not palatable to the Fourth Circuit because it would lead to a "displacement of state law with federal policies" of a magnitude that "would be difficult to overstate." *Id.* Therefore, as in *Collins,* where the Supreme Court held that state employees do not have a substantive due process right to a safe workplace, the Fourth Circuit strongly implied in its *Waybright* dicta that the Due Process Clause of the United States Constitution does not impose a duty on municipalities to provide their students with a safe environment—whether on a "playground," "football" field, or on a "class field trip[ ]." *Id.*

"Sometimes practice is demanding because games are demanding ... and how best to conduct these sessions can *rarely* be the focus of a constitutional claim." *Id.* (emphasis added). By using the word "rarely," the court recognized that injury caused at the hands of school actors can in some limited circumstances be the subject of a due process claim. For example, when conduct on the part of the school is intended to injure, such conduct implicates substantive due process protections. Since the Plaintiff in the present case has not alleged conduct intended to injure, but rather has only pled recklessness or gross negligence in creating and responding to a state-created danger, the due process clause is not implicated. The state-created danger doctrine does not impose an affirmative duty on a municipality to provide a

safe school environment on the facts alleged in this case. Additional considerations also dictate this result.

### (b). Interaction with state tort law

Second, the type of injury that occurred in the present case is one which is also within the realm of state tort law. In *Waybright,* the Fourth Circuit considered such a scenario. There it stated that "[t]he *Fourteenth Amendment's Due Process Clause* protects a set of interests— life, liberty, and property—that are also protected by state tort law." *Waybright,* 528 F.3d at 204. As a result, if the Due Process Clause and § 1983 are construed too broadly, "there is some risk of the Clause supplanting state tort law in almost any suit alleging that a local official has caused harm." *Id.* The Supreme Court has counseled that the Fourteenth Amendment should not be " 'a font of tort law to be superimposed upon whatever systems may already be administered by the States.' " *Id.* (quoting *Paul,* 424 U.S. at 701, 96 S.Ct. 1155). That is because "decisions about how to allocate resources in state government 'involve a host of policy choices that must be made by locally elected representatives, rather than by federal judges interpreting the basic charter of Government for the entire country.' " *Id.* at 205 (quoting *Collins,* 503 U.S. at 129, 112 S.Ct. 1061). Given the admonition from the Fourth Circuit and the Supreme Court regarding the Due Process Clause's interplay with state tort law, this Court is hesitant to extend the state-created danger doctrine deeper into the realm of state tort law by applying it to incidents of unintentional harm caused by the alleged gross negligence of school employees—a realm where the doctrine has not been applied historically in this Circuit. This cautionary approach is especially appropriate in light of this Court's third consideration.

### (c). Judicial Self–Restraint and Utmost Care

Third, the Fourth Circuit has often counseled that "courts should exercise 'judicial self-restraint' and 'utmost care' in novel substantive due process cases." *Id.*

> [C]ourts must be 'reluctant to expand the concept of substantive due process because guideposts for responsible decision-making in this uncharted area are scarce and open-ended,' which means that the courts must 'exercise the utmost care whenever we are asked to break new ground in this field, lest the liberty protected by the Due Process Clause be subtly transformed into the policy preferences of [judges].'

*Hawkins v. Freeman*, 195 F.3d 732, 738 (4th Cir.1999) (internal citations omitted). Applying the state-created danger doctrine in the context of an alleged unintentional harm caused by a school official would be a novel substantive due process claim. Therefore, the Court has treaded cautiously in determining whether to so extend the doctrine. As mentioned previously, in the *Waybright* opinion, the Fourth Circuit cautioned against inserting "federal authority into public school playground incidents, football (or even ballet) practice sessions, and class field trips...." *Waybright*, 528 F.3d at 208. If this Court were to apply the state-created danger doctrine to the facts alleged in the Amended Complaint, it essentially would be allowing the type of claim that the Fourth Circuit counseled against in *Waybright*. As a result, the Court, exercising judicial self-restraint, concludes that the state-created danger doctrine does not impose an affirmative duty on a municipality to provide a safe school environment on the facts alleged here.

### (d). Plaintiff has not Pled a Due Process Violation

In the present case, the Plaintiff has alleged that the state created a danger of excessive moisture and mold conditions, and then directly harmed the Plaintiff by conducting misleading testing, concealing the true conditions in the School, and failing to properly remedy that situation. Since the Court held above that the state-created danger doctrine does not apply to such situations, it is not a "special circumstance" under which the Plaintiff can assert a plausible substantive due process claim. Moreover, since the "special relationship" doctrine, requiring the state to affirmatively protect those in its custody, is also inapplicable to the present case, there are no "special circumstances" warranting the application of the Due Process Clause to the "middle ground" of culpability. Lastly, the Plaintiff has not alleged intentional conduct "intended to injure." *Id.* at 205. As a result, Defendants' Motion to Dismiss Count VII of the Plaintiff's Amended Complaint, which asserts a substantive due process violation under 42 U.S.C. § 1983, is **GRANTED**.

### C. Counts I and II Revisited

In the Court's previous discussion of Count I, it noted the Fourth Circuit's admonition that if there are "no underlying constitutional violations by any individual, there can be no municipal liability." *Grayson*, 195 F.3d at 697. Since the Court concluded above that the Plaintiff has not alleged an underlying constitutional violation by an individual, the School Board can also not be held liable on a theory of substantive due process. Consequently, Defendants' Motion to Dismiss Counts I and II is **GRANTED**.

### D. Count VI—The Remaining Constitutional Claim

In Count VI, the Plaintiff asserts a constitutional due process violation against James D. Thorsen and Terry Napier, in both their individual and official capacities. Count VI closely mirrors Count I, discussed previously. In Count VI, the

Amended Complaint alleges a *Monell* claim, asserting that Thorsen and Napier violated the Plaintiff's liberty interest in bodily integrity through a custom and policy. More specifically, it is alleged that the violation occurred when the two individuals: (1) knowingly engaged in mold investigations even though they were untrained and unqualified; (2) engaged in mold remediation, knowing they were untrained and unqualified; (3) concealed from Plaintiff the excessive moisture and mold conditions in the School; and (4) promulgated a policy, custom or procedure that knowingly failed to adequately identify and assess the seriousness of the mold conditions in the School. Am. Compl. ¶ 162. Additionally, the Count alleges that the Defendants participated in pre-sampling cleaning in order to mask moisture and mold conditions. Am. Compl. ¶ 159.

However, as mentioned previously, in order to be held liable for a custom or policy that violates constitutional protections, the Plaintiff must allege an underlying constitutional violation that was proximately caused by the allegedly unconstitutional custom or policy. Since the Plaintiff has failed to allege an underlying constitutional violation, the Court **GRANTS** Defendants' Motion to Dismiss Count VI for the same reasons it did with respect to Count I. Because these claims have been dismissed, the Court need not analyze the issues of immunity, with respect to the constitutional claims, raised by the Defendants in their briefs.

*E. Remaining Claims under State Law*

Plaintiff's Amended Complaint includes six additional claims that arise under state law. In claims III and VIII, the Plaintiff asserts causes of action grounded in fraud against the School Board (claim III) and Thorsen and Napier, in both their individual and official capacities (claim VIII). Claims IV and IX assert actions based upon a theory of gross negligence against the School Board (claim IV) and against Thorsen and Napier, in their official and individual capacities (claim IX). Lastly, in the alternative, claims V and X assert causes of action grounded on a theory of negligence against the School Board (claim V) and Thorsen and Napier, in both their individual and official capacities (claim X). Given that the federal claims have been dismissed, the Court must determine whether to continue to exercise supplemental jurisdiction over the state law claims, or remand the case to state court.

According to 28 U.S.C. § 1367, discussing supplemental jurisdiction of the United States District Courts,

in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

28 U.S.C. § 1367(a). However, subsection (c) of that statute states that "[t]he district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if ... (3) the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C § 1367(c). "[U]nder the authority of 28 U.S.C. § 1367(c), authorizing a federal court to decline to exercise supplemental jurisdiction, a district court has inherent power to dismiss the case or, in cases removed from State court, to remand, provided the conditions set forth in § 1367(c) for declining to exercise supplemental jurisdiction have been met." *Hinson v. Norwest Fin. S.C., Inc.,* 239 F.3d 611, 617 (4th Cir.2001). In making the determination regarding whether to retain jurisdiction, the Fourth Circuit has held that section 1367(c) provides the trial court with "wide latitude in

determining whether or not to retain jurisdiction over state claims when all federal claims have been extinguished." *Shanaghan v. Cahill,* 58 F.3d 106, 110 (4th Cir. 1995).

In exercising this discretion, the Court must consider the "convenience and fairness to the parties, the existence of any underlying issues of federal policy, comity, and considerations of judicial economy." *Id.* In the present case, it would not be prohibitively inconvenient for the parties if the case was remanded to state court. The Plaintiff initially chose state court as a forum, and the Defendant recognized the possibility of the action returning to state court in its brief when it stated that Plaintiff may "refile in state court if Plaintiff chooses to pursue these claims." Defs'. Br. 17. Moreover, since one of the primary bases for the Court's cautious approach to its substantive due process analysis above was a respect for state tort law, it seems logical to allow the state courts to address the issues of fraud, gross negligence and negligence. Additionally, given the fact that there are no federal issues remaining, the Virginia state courts are particularly well-suited to address all the remaining non-federal issues. Lastly, since the case is at a relatively early stage in the litigation, with discovery yet to commence, it would not offend notions of judicial economy to remand the case to the original state court from which it was removed. Consequently, the Court **RE-MANDS** counts III, IV, V, VIII, IX and X to the Circuit Court for the City of Suffolk.

### IV. Conclusion

Based on the foregoing analysis, the Court **GRANTS** Defendants' Motion to Dismiss Plaintiff's Amended Complaint with respect to Counts I, II, VI and VII, and **REMANDS** the remaining counts to the Circuit Court for the City of Suffolk for such further proceedings as it may deem appropriate. More specifically, as to

Counts I and VI, the Court concludes that the failure to adequately allege an underlying constitutional violation precludes the School Board or Thorsen and Napier from being held liable under 42 U.S.C. § 1983 for the alleged customs, policies or failures of those Defendants. Similarly, the Plaintiff has failed to plausibly allege conduct in Counts II and VII that rises to the level of a substantive due process violation. This conclusion stems from the fact that the Plaintiff failed to allege conduct intended to injure, and none of the special circumstances, that must exist before culpability in the "middle ground" implicates the Due Process Clause, are applicable. Consequently, since the Court has dismissed the federal claims, it declines to exercise supplemental jurisdiction over the remaining state claims, and **REMANDS** those claims to the Circuit Court for the City of Suffolk.

The Clerk is **DIRECTED** to send a copy of this Order to all counsel of record.

**IT IS SO ORDERED.**